**Shirley WINGROVE, et al., Plaintiffs,**

v.

**Cpt. Chris E. FORSHEY,
et al., Defendants.**

**No. 01–CV–1142.**

United States District Court,
S.D. Ohio,
Eastern Division.

Nov. 13, 2002.

Harry G. Deitzler, Hill, Peterson, Carper, Bee & Deitzler, Charleston, WV, John Spenceley Marshall, Columbus, OH, for Plaintiffs.

Cheri B. Hass, Downes, Hurst & Fishel, Columbus, OH, Randall Lee Lambert, Ironton, OH, for Defendants.

## OPINION AND ORDER

MARBLEY, District Judge.

## I. INTRODUCTION

This matter is before the Court on the Defendants' Motions for Summary Judgment. Defendants Chris E. Forshey, Robert R. Schlicher, Jr., and William W. Wilson jointly filed two Motions for Summary Judgment: (1) a Motion for Summary Judgment with respect to the claims brought against them in their individual capacities; and (2) a Motion for Summary Judgment with respect to the claims brought against them in their official capacities, which was also joined by Defendant Washington County. The Court held a hearing on the Motions on October 3, 2002. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367.

For the following reasons, with respect to the Motion filed by the Defendants in their individual capacities, the Court **GRANTS** the Defendants' Motion for Summary Judgment in part, and **DENIES** that Motion in part. With respect to the Motion filed by the County and the Defendants in their official capacities, the Court **GRANTS** the Defendants' Motion for Summary Judgment in its entirety.

## II. FACTS AND PROCEDURAL HISTORY

### A. Facts

Because this matter is before the Court on the Defendants' Motions for Summary Judgment, the Court views the facts in the light most favorable to the Plaintiffs.

On October 15, 1998, Patrol Officer Everet Misner ("Ptl.Misner") of the Marietta Police Department received information from a confidential informant ("CI–1") that Plaintiff Albert Bonar ("Albert") and his neighbor, Steve Barnhardt ("Barnhardt"), were engaged in the illegal cultivation of and trafficking in marijuana. CI–1 also indicated that, at least on one occasion, Albert had illegally removed the serial number from a firearm he kept in his home.

After receiving the information about Albert from CI–1, Ptl. Misner contacted the Washington County Sheriff's Office ("WCSO") for assistance in drafting an affidavit and in obtaining a search warrant for the Barnhardt and Bonar residences. In preparing the affidavit, WCSO Detective Brian Schuck ("Schuck") spoke with Detective David Garvey ("Garvey") of the Belpre Police Department. Garvey told Schuck that another confidential informant ("CI–2") informed him that the Bonar house had a high volume of traffic, and that one of the residents routinely engaged in target practice out of the rear window of his residence.

The WCSO took primary responsibility for obtaining and executing a search warrant on the Bonar and Barnhardt residences. Based upon the information gathered from CI–1 and CI–2, as set forth in an affidavit, Washington County Common Pleas Court Judge Timothy Williams is-

sued a search warrant for both the Barnhardt and Bonar residences. Judge Williams authorized the WCSO to execute the warrant either during the day or evening of October 15, 1998. The warrant issued was a "knock and announce" warrant.[1] The Bonar residence, where the warrant was to be executed, is a double-wide modular trailer home with five rooms—two bedrooms, a kitchen, a bathroom, and a living room. The living room is rectangular (19'9" long and 14'4½" wide), with the front door of the trailer at the northeast end of the room.

Six officers executed the search warrant on the Bonar residence.[2] The officers were members of the WCSO's Special Response Team ("SRT"). The SRT was established in 1992 when Defendant Robert R. Schlicher ("Sheriff Schlicher") was first elected sheriff. Since that time, Defendant Captain Chris E. Forshey ("Cpt.Forshey") has been in charge of the SRT. The SRT executes warrants when the Sheriff's Office has reason to believe execution of the warrant poses a significant safety risk to the officers involved. The Defendants state that, in this case, the SRT was used because the officers believed that individuals in the Bonar residence had loaded guns in the home, ready to be used.

At the time that they executed the search warrant, the SRT officers were dressed in their SRT uniforms, which were olive green flight suits with a Sheriff's Office patch on each sleeve. Over their flight suits, the officers wore black bulletproof vests on which the word "Sheriff" was printed in yellow lettering on the front and back. They also wore five-point star sheriff's office badges on the right side of their vests, along with helmets, boots, and gloves.

The officers executed the warrant at approximately 9:00 p.m. on October 15, 1998.[3] The officers were driven in one vehicle, a large converted ambulance, to the Bonar residence. The vehicle stopped on the road in front of the residence, approximately fifty feet from the front door. As soon as the vehicle came to a stop, the SRT officers formed into a "stack," with one officer behind the other, in the following order: Deputy Brown, Defendant William W. Wilson ("Sgt.Wilson"), Defendant Cpt. Forshey, Lt. Huffer, Lt. Coppernoll, and Sgt. Underwood. The stacked officers ran or jogged from the road to the front door in that formation. The driver of the vehicle turned on the flashing lights as the officers approached the front porch.

At the time of the officers' arrival, all three residents of the Bonar home were present: (1) Delbert Bonar ("Delbert"), the owner; (2) Albert, Delbert's son; and (3) Carolyn Bonar ("Carolyn"), Albert's wife. Carolyn, Albert, and Delbert were in the living room of the Bonar residence, watching television. Carolyn was sitting on a couch along the north wall of the house and to the right as one enters the front door. Albert was also sitting to the right of the front door, on a chair just to the left of the couch on which Carolyn was sitting. Delbert was sitting in a chair in the northwest corner of the living room, furthest away from the front door. Earlier that day, Delbert had purchased two guns from his girlfriend. When the war-

---

1. Under a "knock and announce" warrant, before the officers may use force to enter the residence, they must knock and be refused entry or constructively be refused entry. By contrast, a "no knock" warrant allows the officers to force entry into a residence the moment they arrive.

2. Other officers were also present, securing the curtilage and outbuildings, including a garage and a storage shed, outside the home.

3. At the same time, other WCSO officers executed a search warrant at the Barnhardt residence.

rant was executed, both unloaded guns were laying side by side on an ottoman approximately five or six feet from the chair in which Delbert was sitting.[4]

From inside the residence, Albert noticed the flashing lights outside and got up from his chair to open the door to see what was going on. Albert turned on the front porch light, and began to crack open the front door. Around the same time, Cpt. Forshey was outside, announcing, "Sheriff's Office, Search Warrant." Cpt. Forshey also knocked on the side of the trailer, but by the time he heard the knock, Albert was already beginning to crack the door open.[5]

As soon as Albert cracked the door open approximately three inches, Deputy Brown moved inside the residence, immediately followed by Defendant Sgt. Wilson, Defendant Cpt. Forshey, and Lt. Huffer. Deputy Brown immediately moved to secure Albert, grabbing him and taking him to the floor approximately halfway into the entryway of the residence. Sgt. Wilson turned to the right, into the living room, and then Cpt. Forshey entered and crossed the residence into the east corner of the living room. All of this happened within a matter of seconds from the time Albert began to crack open the door.

According to Carolyn,[6] when the officers entered the residence, Delbert, who had been holding a water bottle in his hand, moved to set it down. As he set down the bottle, one of the officers (either Cpt. Forshey or Sgt. Wilson) began shooting at him. Then Delbert picked up the phone that was next to him, and another officer

(either Cpt. Forshey or Sgt. Wilson) shot at him. In all, Delbert was struck by eight rounds: he was shot twice in the back, twice in the left side with a bullet path going from back to front, once through the left arm and left side in a downward angle, once in the left side with a bullet path leading cross-ways through the heart, diaphragm, and stomach, once in the left side with a bullet path leading downward across the intestines, and once in the right fifth finger. Carolyn, who had been looking at Delbert when he was shot, saw him slump over in his chair, with the phone still in his hand. Carolyn then screamed, and jumped up to go to Delbert. At that point, an officer told her to sit down and shut her mouth, or she'd wind up like Delbert. Carolyn stated that the officers started shooting at Delbert as soon as they were in the door, and had finished shooting before the last two officers had entered the residence.

Contrary to Carolyn's recollection of the events leading up to the shooting, the Defendants claim that, as soon as he entered the residence, Cpt. Forshey announced, "Sheriff's Office," and instructed the residents to, "Get Down." Delbert, however, did not comply with the instruction to get down, but instead began to rise up out of his chair while picking up one of the guns that had been laying on the ottoman. Sgt. Wilson states that Delbert then pointed the gun directly at his head. On seeing Delbert pick up the gun, Deputy Brown and Sgt. Wilson claim that they announced, "Gun" to alert the other officers

---

**4.** The Defendants contend that the ottoman with the guns was right next to the chair in which Delbert was sitting at the time the warrant was executed.

**5.** During his deposition, Albert testified as follows:

Q: ... And then you opened the door as soon as they knocked or—

A: I was opening the door at the time.
Q: About the time they were knocking?
A: When I seen them, they was coming down through the yard.

**6.** Albert was unable to see precisely what took place because Deputy Brown had put him face down on the floor as soon as he entered the residence.

to the danger. The Defendants also state that Officers Brown, Wilson, Huffer, and Forshey each instructed Delbert to drop the gun, but Delbert continued to move into an upright position, shouldering the weapon and bringing it to bear on the officers.[7] Cpt. Forshey and Sgt. Wilson claim that it was in response to this movement that they simultaneously shot Delbert. The two officers assert that neither was aware that the other had discharged his weapon until after the shooting.

The officers attempted to administer CPR to Delbert, but he died before an ambulance arrived. Immediately following the shooting, the officers secured the residence, and notified Sheriff Schlicher of the incident. Sheriff Schlicher contacted the Bureau of Criminal Identification and Investigation ("BCI"), requesting that BCI employees respond immediately, take control of the scene, and conduct an investigation of the shooting. Following BCI's search of the residence for evidence regarding the shooting, WCSO completed its search of the residence in accordance with the search warrant for illegal drugs and firearms issued on October 15, 1998. WCSO recovered 97.8 grams of marijuana and some drug paraphernalia.[8] The officers also recovered multiple firearms, but none was either stolen or reconditioned. No charges were ever brought against any of the residents of the Bonar home.

### B. Procedural History

The Plaintiffs, Shirley Wingrove, individually and in her capacity as administrator of the estate of Delbert Dean Bonar, Albert Bonar, Dean Bonar, and William Bonar, individually, filed this Complaint on November 2, 2001 against the Defendants, Cpt. Chris E. Forshey, in his individual and official capacities, Washington County, Ohio, Sheriff Robert R. Schlicher, Jr., in his official capacity, and Sgt. William W. Wilson, in his individual and official capacity.[9] The Plaintiffs filed the Complaint in the Court of Common Pleas of Washington County, Ohio, but the Defendants removed the case to this Court on November 19, 2001. In their Complaint, the Plaintiffs assert the following causes of action: (1) excessive use of force and wrongful death in violation of 42 U.S.C. § 1983 (all Defendants); (2) excessive use of force and wrongful death in violation of 42 U.S.C. § 1983—unconstitutional policy and/or practice of the Washington County Sheriff's Office (Defendant Washington County); (3) excessive use of force and wrongful death in violation of 42 U.S.C. § 1983—deliberate indifference in training and supervising (Defendant Washington County); (4) survivorship (Defendants Forshey and Wilson); and (5) wrongful death (Defendants Forshey and Wilson). This matter is now before the Court on the Defendants' Motions for Summary Judgment. The first Motion seeks summary judgment on the individual capacity claims filed against Defendants Forshey and Wilson in the Plaintiffs' first, fourth, and fifth causes of action, and against Defendant Schlicher in the first cause of action. The second Motion seeks summary judgment on all of the official capacity claims and the claims filed against Washington County.

---

7. It is unclear whether Delbert is alleged to have pointed the gun at Sgt. Wilson or Cpt. Forshey. Sgt. Wilson claims that Delbert pointed the gun directly at his head, while Cpt. Forshey claims that, as Delbert stood, he brought the gun to bear on him, that is, on Cpt. Forshey.

8. The maximum penalty for possession of less than 100 grams of marijuana, a minor misdemeanor, is a $100 fine.

9. The Complaint that was filed on November 2, 2001 was a re-filed complaint, restating claims that had been set forth in a prior state court action that was dismissed on procedural grounds on October 18, 2001.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.,* 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *see*

*Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Searcy v. City of Dayton,* 38 F.3d 282, 286 (6th Cir.1994). Furthermore, the mere existence of a scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).

## IV. ANALYSIS

### A. Preliminary Issue: Effect of State Court's September 18, 2001 Ruling

Prior to filing the instant action, the Plaintiffs filed a complaint in the Washington County Court of Common Pleas on October 13, 1999 ("original action"). The complaint filed in the original action was substantially similar to the Complaint filed in the matter *sub judice,* but named additional defendants, and set forth additional causes of action, including a claim of conspiracy. On February 24, 2001, the plaintiffs in the original action voluntarily dismissed the conspiracy claim as against all of the defendants, and voluntarily dismissed their state wrongful death and survival claims as against Defendant Washington County. On September 18, 2001, the state court ruled that the WCSO's knock and announce search warrant policy was constitutional, and was properly carried out by the Defendant officers on the night that Delbert Bonar was killed. Then, on October 18, 2001, the state court ruled that the effect of the plaintiffs' February 24, 2001 voluntary dismissal was a dismissal of all claims against all of the defendants designated in the dismissal notice. In its ruling, the court found that the voluntary dismissal divested the state court of subject matter jurisdiction over the original action.

During a status conference in the matter *sub judice,* the parties raised the issue of the legal effect of the state court's September 18, 2001 ruling. Because the state court lacked subject matter jurisdiction over the original action at the time that it rendered its September 18, 2001 ruling, that ruling is void and has no effect on the issues now before this Court. *See Antoine v. Atlas Turner, Inc.,* 66 F.3d 105, 108 (6th Cir.1995) (stating that a judgment is void if the court that rendered it lacks jurisdiction over the subject matter) (citing *In re Edwards,* 962 F.2d 641, 644 (7th Cir.1992)); *Hooks v. Hooks,* 771 F.2d 935, 949 (6th Cir.1985) (citing *Lubben v. Selective Serv. Sys. Local Bd. No. 27,* 453 F.2d 645, 649 (1st Cir.1972), for the proposition that a total lack of subject matter jurisdiction makes a judgment void, which means that it is a complete nullity without legal effect).

The Court recognizes the possibility that the Ohio Court of Appeals could reverse the Court of Common Pleas and find that, in fact, that court retained subject matter jurisdiction at the time that it issued its September 18, 2001 ruling. The Court of Appeals, however, *sua sponte* stayed the appeal from the ruling of the Court of Common Pleas when this Court denied the Plaintiffs' Motion for Remand this matter to the state court. Therefore, this Court must rule on the Motions now before it under the presumption that the state court's finding that it lacked subject matter jurisdiction on September 18, 2001 will remain the law of the case.

Accordingly, the Court proceeds to consider the merits of the Defendants' Motions for Summary Judgment.

## B. Individual Capacity Claims

### 1. 42 U.S.C. § 1983: Merits of the Claim

Section 1983 reads, in relevant part:

Every person who, under color of any statute, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To succeed on a claim for a violation of § 1983, the plaintiff must show that (1) a person (2) acting under color of state law (3) deprived him of his rights secured by the United States Constitution or its laws. *Waters v. City of Morristown,* 242 F.3d 353, 358–59 (6th Cir. 2001). The Defendants do not contest the fact that they are "persons" who were acting under color of state law at the time of this incident. Therefore, the Court must determine whether the Defendants deprived the Plaintiffs of their constitutional rights.

### a. The Knock and Announce Warrant

The Plaintiffs assert that the individual Defendants are liable because they carried out the WCSO's unconstitutional search warrant policy and practice, and thereby caused the death of Delbert Bonar. The Defendants, however, contend that the search warrant policy that they properly carried out on the night Delbert Bonar was killed is constitutional.

The Fourth Amendment to the United States Constitution provides, in relevant part, that "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. In furtherance of this right, the Fourth Amendment requires that law enforcement officers exe-

cute search warrants in a reasonable manner. In particular, in the absence of exigent circumstances, an officer must knock and announce his presence and authority before entering a dwelling. *Wilson v. Arkansas*, 514 U.S. 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995) (determining that the Fourth Amendment's reasonableness inquiry incorporates the common law principle of knock-and-announce); *United States v. Dice*, 200 F.3d 978, 982 (6th Cir. 2000) (citations omitted).[10]

The knock and announce rule exists primarily to protect the occupants of private residences. *Dice*, 200 F.3d at 982. Indeed, the rule serves several interests of the occupants, including: "(1) reducing the potential for violence to both the police officers and the occupants of the house into which entry is sought; (2) curbing the needless destruction of private property; and (3) protecting the individual's right to privacy in his or her house." *Id.* (citing *United States v. Bates*, 84 F.3d 790, 794 (6th Cir.1996)). To insure the preservation of these interests, "[a]n integral part of the knock-and-announce rule is the requirement that officers wait a 'reasonable' period of time after a knock before physically

forcing their way into a residence." *Dice*, 200 F.3d at 983 (citing *United States v. Finch*, 998 F.2d 349, 354 (6th Cir.1993)); *see United States v. Pelayo–Landero*, 285 F.3d 491, 498 (6th Cir.2002) (stating that "officers must wait a 'reasonable period of time' after a knock and announce before physically entering a residence"). By waiting a reasonable period of time after knocking and announcing their presence before forcing their way into a house, the officers give the residents an opportunity to respond voluntarily. *See Finch*, 998 F.2d at 354 (finding it "constitutionally significant" that officers give occupants a reasonable period of time to respond).

The knock and announce rule is not implicated every time an officer executes a search warrant. In particular, officers need not knock and announce their presence when: (1) the individuals inside the residence already know of the officers' authority and purpose; (2) the officers have a justified belief that someone within is in imminent peril of bodily harm; or (3) the officers have a justified belief that those within are aware of their presence and are engaged in escape or the destruc-

---

**10.** The common law knock and announce principles incorporated into the Fourth Amendment knock and announce rule are codified at 18 U.S.C. § 3109, which states that:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109. Similarly, Ohio Rev. Code § 2935.12(A) embodies the principles of the knock and announce rule, and provides that:

When ... executing a search warrant, the peace officer, law enforcement officer, or other authorized individual ... executing the warrant or summons may break down an outer or inner door or window of a

dwelling house or other building, if, after notice of his intention to make the arrest or to execute the warrant or summons, he is refused admittance . . . .

OHIO REV.CODE § 2935.12(A).

The Plaintiffs have not alleged a violation of either of these statutes, nor could they allege a violation of 18 U.S.C. § 3109, as that statute regulates only federal officers. *United States v. Gatewood*, 60 F.3d 248, 249 (6th Cir.1995). Nonetheless, the cases interpreting those statutes are relevant to the extent that they inform the Court's inquiry into whether the Defendants violated the Plaintiffs' Fourth Amendment rights to be free from an unreasonable search. *See United States v. Ramirez*, 523 U.S. 65, 73, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) (holding that § 3109 codifies the common law knock and announce requirements, and recognizing that the common law, in turn, informs the Fourth Amendment).

tion of evidence. *Dickerson v. McClellan*, 101 F.3d 1151, 1159 (6th Cir.1996) (citations omitted). Further, when the residents of the property being searched voluntarily open the door in response to the officer's knock and announcement such that no forcible entry occurs, the Fourth Amendment is not implicated. *See United States v. Gatewood*, 60 F.3d 248, 250 (6th Cir.), *cert. denied*, 516 U.S. 1001, 116 S.Ct. 546, 133 L.Ed.2d 448 (1995) (finding that the Fourth Amendment was not implicated where there was no forcible entry). Similarly, a number of circuit courts have concluded that entry through an open door does not implicate the Fourth Amendment's knock and announce requirement. *See United States v. Remigio*, 767 F.2d 730, 733 (10th Cir.), *cert. denied*, 474 U.S. 1009, 106 S.Ct. 535, 88 L.Ed.2d 465 (1985) (collecting cases).

*Gatewood* embodies the Sixth Circuit's interpretation of the knock and announce rule. In *Gatewood*, one of the officers who executed the search warrant "knocked" by kicking on the defendant's door with his foot. *Gatewood*, 60 F.3d at 249–50. The officers also announced their presence by shouting, and then waited approximately ten seconds before entering the residence. *Id.* at 250. During a hearing, the individual who opened the door to the residence when the officers entered testified as follows:

Q: Okay. Could you hear a knock?

A: Yes, ma'am. I didn't consider it as a knock, I thought the kids were playing at the door. The only thing I heard was boom and I seen a head fly past my window.

Q: What, slow down, saw what?

A: I saw a head run past my window, I thought it was just kids outside playing, and then I heard it again. I unlocked the door, when I unlocked it came open, whoom, and came in with guns and ev-

erything and said lay down. So I laid down.

Q: You said unlocked, is there a dead bolt?

A: That is what I unlocked, the dead bolt.

*Id.* Under these circumstances, the Sixth Circuit found that there had been no forcible entry, and that, therefore, the Fourth Amendment was not implicated. *Id.* The court noted, in *dicta*, that even if the entry had been forced, the officers did not violate the Fourth Amendment because they knocked and announced, and then waited a reasonable length of time before entering. *Id.*

■ Under the WCSO's knock and announce policy, officers executing a "knock and announce" search warrant must knock on the door of the residence into which they are seeking entry, and announce their intentions. The officers then wait approximately thirty to forty-five seconds. If they receive no answer from the residents by that time, then they breach the door, and force entry into the residence. If, however, an individual inside the residence opens the door in response to the officers' knock and announcement, then the officers will enter and contain anyone in the residence. Pursuant to the policy, officers may enter the residence as soon as someone inside begins to open the door, even if the individual only cracks the door open a tiny bit.

The Plaintiffs contend that the WCSO knock and announce policy is unconstitutional based on the fact that it encourages officers to force their way into residences as soon as someone inside begins to crack open the door. They argue that the Defendants acted unconstitutionally when, in accordance with that policy, they forced their way into the Bonars' home "instantly" when knocking and announcing their presence. Further, the Plaintiffs claim

that the Defendants acted improperly because they failed to wait a sufficient period of time after knocking and announcing their presence before forcing entry into the Bonar home. They contend that, by their actions, the Defendants committed an unconstitutional "intrusion." *See Sabbath v. United States,* 391 U.S. 585, 590, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968) ("An unannounced intrusion into a dwelling . . . is no less an unannounced intrusion whether officers break down a door, force open a chain lock on a partially open door, open a locked door by use of a passkey, or . . . open a closed but unlocked door.").

 The Court finds that the the WCSO's knock and announce policy is constitutional as a matter of law, and that the Defendants acted in accordance with that lawful policy when they executed the search warrant on the Bonar residence. Viewing the facts in the light most favorable to the Plaintiff, it is undisputed that Albert Bonar began to crack open the front door of the residence after seeing and hearing something outside. After he did so, the officers moved into the residence. In light of the fact that the officers entered through a door that was voluntarily cracked open, as the WCSO policy allows them to do, the officers did not execute a forced entry, and, therefore, did not implicate the Fourth Amendment. *See Gatewood,* 60 F.3d at 250 (concluding that "there was no forcible entry, and thus

neither § 3109 nor the Fourth Amendment is implicated").[11]

*Gatewood* dictates the Court's conclusion that the officers did not execute a forced entry when they entered the residence after Albert cracked the door open a few inches. In *Gatewood,* when the officers approached the residence, the suspect heard and saw something outside, but thought it was merely children playing, knocking against the door in the course of their play. After seeing and hearing this something or someone outside, the suspect went to the door and unlocked it. In unlocking the dead bolt, the door apparently opened slightly, and the officers immediately entered. Under those circumstances, the Sixth Circuit found that the officers had entered through an open door, and the Fourth Amendment was not implicated. *Gatewood,* 60 F.3d at 250.

Similarly, here, Albert Bonar heard and saw something outside, but he was unsure what it was. After seeing and hearing something, he went to the front door, and began to open it. Unlike the individual in *Gatewood,* however, he did not simply unlock the door, but actually physically opened it at least a few inches. It was only after he began to open the door voluntarily that the officers entered the residence. In light of *Gatewood,* the Court finds that the officers entered the Bonar residence through a voluntarily opened door, and, accordingly, their entry did not implicate the Fourth Amendment.[12]

---

**11.** Although the Plaintiffs argue that the officers failed to wait a reasonable amount of time after knocking and announcing their presence before entering the Bonar home, the Court need not address this argument in light of the fact that the entry into the residence was not forced. Because there was no forced entry, the Plaintiffs' Fourth Amendment rights could not have been violated, no matter how much time lapsed between the knock and announcement and the entry.

**12.** The Court notes that, while the Plaintiffs rely on case law from the Eleventh and D.C. Circuits indicating that officers force entry when they fully open a partially opened door, *see United States v. Tolliver,* 665 F.2d 1005, 1008 (11th Cir.1982) and *United States v. Kemp,* 12 F.3d 1140 (D.C.Cir.1994), the Sixth Circuit has, at least implicitly, rejected those cases. In particular, where the *Gatewood* majority found no forced entry, it was the dissent in *Gatewood* that relied on *Tolliver* and *Kemp* for its argument that the majority erred.

Moreover, case law from the Seventh Circuit clearly supports this conclusion. In *United States v. Salter*, 815 F.2d 1150 (7th Cir.1987), the Seventh Circuit determined that an officer who pushed open a partially open door entered through an open door, and, therefore, did not violate the knock and announce rule. *Id.* at 1152 (discussing the defendant's claim that the officer had violated the Fourth Amendment when the officer put his foot in a doorway to prevent the door from closing after the defendant had partially opened the door from inside). In reaching its determination, the *Salter* court relied on *United States v. Syler*, 430 F.2d 68 (7th Cir.1970). In *Syler*, police officers induced the suspect to partially open his front door by means of a ruse. As soon as the suspect began to open the door, the officers pushed the door fully open and entered the residence. Under these circumstances, the Seventh Circuit held that the officers had not committed an intrusion in violation of § 3109's knock and announce requirement. *Id.* at 70. Both *Salter* and *Syler* indicate that entry through a door that a resident partially opens does not implicate the knock and announce rule of the Fourth Amendment.

Therefore, the Court **GRANTS** the Defendants' Motion for Summary Judgment with respect to the Plaintiffs' claims brought pursuant to 42 U.S.C. § 1983 based on the Defendants' execution of the knock and announce search warrant.

#### b. *Use of Deadly Force*

The Plaintiffs also contend that Defendants Forshey and Wilson violated the Fourth Amendment when they used deadly force against Delbert Bonar. This claim relates to Cpt. Forshey and Sgt.Wilson equally as both officers have admitted to shooting Delbert Bonar at the same time.

▉▉▉▉ A law enforcement officer has the legal right to use deadly force if the officer has reasonable cause to believe that the suspect poses an immediate threat to the safety of the officer or others, and that deadly force is needed to avoid that threat. *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902–03 (6th Cir.1998). In determining whether an officer's use of deadly force was objectively reasonable, the Court is to consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight." *Id.*

The Defendants contend that their use of deadly force was objectively reasonable under the circumstances of this case because, when they executed the search warrant, Delbert Bonar rose out of his chair pointing a shotgun at the officers, and refused to put the weapon down despite their orders. The Defendants contend that the evidentiary record supports this version of the facts. They point out that all of the officers who witnessed the event testified that Delbert Bonar pointed a gun and refused to put it down. They also claim that several individuals who did not see the shooting but were within hearing range testified that they heard officers shout "gun" or "drop the gun." In addition, the Defendants point to certain physical evidence that supports their version of the facts. For instance, the Defendants contend that, prior to their execution of the search warrant, the guns that Delbert had purchased were in perfect condition, but after the shooting, one gun had significant damage on the left side of the butts-

tock. According to the Defendants' forensic experts, the damage indicates that the pistol had been damaged by a bullet. The Defendants also claim that the way in which one bullet struck Delbert's finger indicates that he was holding a gun at the time that he was shot. Finally, the Defendants note that neither the telephone nor the water bottle that Delbert was allegedly holding at the time he was shot was damaged in the shooting.

The Plaintiffs contend, however, that the evidence supports their claim that Delbert was peaceably sitting in a chair, holding first a water bottle, and then a phone, at the time that he was shot. First, the Plaintiffs point out that Carolyn Bonar testified as to this version of the facts. Second, they note that Delbert was shot in the back and left side by Cpt. Forshey, and the bullets traveled downward. Similarly, one of Sgt. Wilson's bullets also traveled in a downward direction. The Plaintiffs argue that none of the bullets could have traveled in this manner if Delbert had been standing at the time he was shot, as the Defendants contend he was.

In light of the evidence set forth by both the Plaintiffs and the Defendants, the Court finds that a genuine issue of material fact prevents the Court from determining whether the Defendants acted in an objectively reasonable manner when they used deadly force against Delbert Bonar. Although the Defendants may be correct that it would have been reasonable for them to shoot at Delbert if he was aiming a gun at them and refused to put that gun down despite their commands, the Plaintiffs dispute that version of the facts. Indeed, if the Plaintiffs are correct that, at the time that he was shot, Delbert Bonar was sitting peaceably in a chair, out of reach of the unloaded guns that were in the room, then the Defendants most likely could not be found to have reasonably applied deadly force. Signifi-

cantly, both the Plaintiffs and the Defendants have presented testimonial and physical evidence that supports their respective versions of the facts. Accordingly, the question of whether the Defendants acted reasonably when they shot Delbert Bonar turns on a question of fact that must be resolved by a jury at trial.

Therefore, the Court **DENIES** the Defendants' Motion for Summary Judgment with respect to the Plaintiffs' claim, brought pursuant to 42 U.S.C. § 1983, that Defendants Wilson and Forshey violated Delbert Bonar's Fourth Amendment right to be free from the excessive use of force.

### 2. 42 U.S.C. § 1983: Qualified Immunity

The Defendants contend that they are entitled to qualified immunity from the Plaintiffs' Fourth Amendment claims. Because the Court has already determined that the Defendants did not violate the Plaintiffs' Fourth Amendment rights when they executed the knock and announce search warrant, the Court proceeds to consider the Defendants' claim for qualified immunity only with respect to the Plaintiffs' claim that the Defendants' violated the Fourth Amendment through their alleged excessive use of force.

Government officials sued in their individual capacities are entitled to seek qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity extends to individuals performing discretionary functions unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* A right is "clearly established" if "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). While the defendant bears the initial burden of set-

ting forth facts tending to show that he is entitled to qualified immunity, the burden then shifts to the plaintiff to prove that a defendant is not entitled to qualified immunity because he violated clearly established rights. *Gardenhire v. Schubert,* 205 F.3d 303, 311 (6th Cir.2000).

 The Sixth Circuit has created a three-part test to determine whether a defendant is entitled to qualified immunity. Pursuant to that test, the Court is to examine: (1) whether the facts taken in the light most favorable to plaintiff could establish a constitutional violation; (2) whether the right was a "clearly established" right of which any reasonable officer would have known; and (3) whether the official's actions were objectively unreasonable in light of that clearly established right. *Risbridger v. Connelly,* 275 F.3d 565, 569 (6th Cir.2002) (citing *Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999) (*en banc* )). "Although the application of qualified immunity comprises a legal issue, summary judgment is inappropriate when conflicting evidence creates subordinate predicate factual questions which must be resolved by a fact finder at trial." *Hamilton v. Myers,* 281 F.3d 520, 531 (6th Cir.2002) (citing *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034).

 The Defendants argue that, even if a genuine issue of material fact remains with respect to whether the officers acted in response to Delbert Bonar's threat of force, they are nonetheless entitled to summary judgment on the basis of qualified immunity. They claim that they are entitled to qualified immunity because they reasonably, but mistakenly, believed that Delbert Bonar posed a deadly threat to them at the time that they shot him. In particular, they claim that, although they may have been mistaken, the Defendants reasonably believed that Delbert was either holding a gun or was reaching for one at the time that they shot him. According-

ly, they assert that they are entitled to qualified immunity. *See Anderson v. Russell,* 247 F.3d 125, 131 (4th Cir.2001) (granting qualified immunity to an officer who shot a man whom the officer believed to be reaching for a gun, but who was actually reaching to turn off his walkman); *Bell v. City of East Cleveland,* 125 F.3d 855, 1997 WL 640116 at *3 (6th Cir.1997) (granting qualified immunity to an officer who shot and killed a fourteen-year-old boy whom the officer believed to be holding a gun, but who was actually holding a toy gun).

The Court finds that the Defendants are not entitled to qualified immunity with respect to this claim. First, when viewed in the light most favorable to the Plaintiffs, the facts establish that the Defendants violated Delbert Bonar's right to be free from excessive force because the officers had no reasonable basis for believing that he posed an immediate threat at the time that they shot him. Second, the right to be free from excessive force was clearly established at the time of this incident. *See Graham,* 490 U.S. at 395, 109 S.Ct. 1865; *Garner,* 471 U.S. at 17, 105 S.Ct. 1694; *Sova,* 142 F.3d at 902–03. Third, the Defendants acted unreasonably in light of this clearly established right. Specifically, it was unreasonable for the Defendants to mistake either the water bottle or the phone for a gun. The room in which they were executing the warrant was small and well-lit. As such, it should have been fairly easy for the officers to discern precisely what Delbert was holding in his hand. Significantly, neither a water bottle nor a phone resembles a gun or a rifle in a manner that would make it reasonable for those items to be confused. Accordingly, viewed in that light, the Defendants could not have made a reasonable mistake of fact that would have justified their actions in light of the Plaintiffs' clearly established rights.

Therefore, the Court **DENIES** the Defendants' request for qualified immunity with respect to the Plaintiffs' claim that they violated the Fourth Amendment through the excessive use of force.

### 3. Defendant Schlicher's Individual Liability

The Defendants claim that they are entitled to summary judgment on the claims asserted against Defendant Schlicher in his individual capacity. In light of the Court's finding that the WCSO's knock and announce policy is constitutional and was properly executed on the night Delbert Bonar was killed, the Court proceeds to consider only whether Sheriff Schlicher can be individually liable for the officers' alleged excessive use of force.

A supervisor is not liable under § 1983 "absent a showing the official either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir.1982). The Plaintiffs have presented no evidence that, as a supervisor and head of the WCSO, Sheriff Schlicher encouraged, authorized, approved, or acquiesced in the use of deadly force under these circumstances. Further, it is clear that Defendant Schlicher did not directly participate in the use of deadly force, as he was not involved with the Bonars until after Delbert had been killed.

Therefore, the Court **GRANTS** the Defendants' Motion for Summary Judgment with respect to the claims asserted against Sheriff Schlicher in his individual capacity.

### 4. 42 U.S.C. § 1983: Standing

Plaintiffs Albert, Dean, and William Bonar bring claims against the Defendants in their capacities as Delbert Bonar's next of kin and the beneficiaries of his estate. The Defendants contend that, under *Jaco v. Bloechle*, 739 F.2d 239 (6th Cir.1984), these three plaintiffs lack standing to bring a claim under 42 U.S.C. § 1983. *See id.* at 241 (holding that a § 1983 action is a personal action cognizable only by the party whose civil rights were violated).[13] In response, the Plaintiffs contend that, since it was handed down, the Sixth Circuit has questioned the continuing viability of *Jaco. See Purnell v. City of Akron*, 925 F.2d 941, 949 n. 6 (6th Cir.1991) (recognizing that other jurisdictions, including the Ninth, Seventh, Third, and Eighth Circuits, allow immediate family members to bring § 1983 claims in the wrongful death context, and noting that the legislative history of the statute supported such actions).

*Jaco* remains good law within the Sixth Circuit. Although *Purnell* recognized that other circuits allow § 1983 actions by family members of the individual whose constitutional rights were violated, the *Purnell* court specifically reserved deciding whether such claims would be recognized within this circuit. *Purnell*, 925 F.2d at 949 n. 6. Since that time, this Court and other district courts within the Sixth Circuit have declined to allow § 1983 actions by family members in light of the holding in *Jaco. See Alexander v. Beale Street Blues Co., Inc.*, 108 F.Supp.2d 934, 953 n. 16 (W.D.Tenn.1999) (recognizing that *Jaco* continues to be the law of the Sixth Circuit, and holding that a decedent's survivors may not recover for their own damages under § 1983); *Kelly v. Wehrum*, 956

---

**13.** The Defendants do not contest the fact that, as administrator of Delbert Bonar's estate, Wingrove has standing to bring claims under 42 U.S.C. § 1983 for the alleged infringement on Delbert's constitutional rights.

F.Supp. 1369, 1373 (S.D.Ohio 1997) (finding that the mother of the decedent did not have standing to bring a § 1983 claim for the loss of companionship of her son in the wrongful death context); *Gravely v. Madden*, 964 F.Supp. 260, 264 (S.D.Ohio 1995) (concluding that a loss of companionship claim by a parent who has suffered the loss of a child is not cognizable under § 1983); *Broadnax v. Webb*, 892 F.Supp. 188, 190 (E.D.Mich.1995) (holding that a constitutional violation against one individual does not confer standing on that individual's family members). So long as *Jaco* remains the law of this circuit, this Court is duty bound to follow it.

Therefore, the Court **GRANTS** the Defendants' Motion to Dismiss the claims brought pursuant to 42 U.S.C. § 1983 by Plaintiffs Albert Bonar, Dean Bonar, and William Bonar.

### 5. State Law Claims

#### a. Wrongful Death Claim

In their fifth cause of action, the Plaintiffs bring a wrongful death claim under Ohio law against Defendants Wilson and Forshey. Ohio's wrongful death statute provides in pertinent part:

> When the death of a person is caused by wrongful act, neglect, or default which would have entitled the party injured to maintain an action and recover damages if death had not ensued, the person who would have been liable if death had not ensued ... shall be liable to an action for damages, notwithstanding the death of the person injured ....

OHIO REV.CODE § 2125.01.

The Defendants assert that the wrongful death statute does not create a theory of liability, but only preserves the claims an individual may have past his death. Ac-

cordingly, they contend that an essential element of a wrongful death claim is the ability to prove that the decedent would have had a viable cause of action had he survived his injury. The Defendants maintain, based on the arguments set forth above, that Delbert Bonar would not have had a viable claim against the Defendants in their individual capacities, and that they are therefore entitled to summary judgment on the wrongful death claim.

 Contrary to the Defendants' assertions, wrongful death is not a derivative action, but is an independent cause of action. *Thompson v. Wing*, 70 Ohio St.3d 176, 637 N.E.2d 917, 922 (1994). The wrongful death statute creates a new cause of action that is asserted on behalf of the decedent's survivors, "distinct and apart from the right of action which the injured person may have had." *Prem v. Cox*, 2 Ohio St.3d 149, 443 N.E.2d 511, 513 (1983) (citations omitted). Accordingly, the right to bring a wrongful death action does not depend on the existence of a separate cause of action that was or could have been asserted by the decedent immediately prior to his death. *Thompson*, 637 N.E.2d at 922.[14]

Therefore, the Court **DENIES** the Defendants' Motion for Summary Judgment with respect to the Plaintiffs' state law wrongful death claim.

#### b. Survival Claim

In their fourth cause of action, the Plaintiffs bring a claim of survivorship under Ohio law against Defendants Wilson and Forshey. Ohio Rev.Code § 2305.21 states that:

> In addition to the causes of action which survive at common law, causes of action

---

**14.** The Court notes that, even if the Defendants were correct in their argument that the wrongful death statute does not create a theory of liability, Delbert Bonar clearly would

have had a cause of action against the Defendants in their individual capacities based on their alleged excessive use of force.

for mesne profits, or injuries to the person or property, or for deceit or fraud, also shall survive; and such actions may be brought notwithstanding the death of the person entitled or liable thereto.

OHIO REV.CODE § 2305.21.

As they do with respect to the wrongful death claim, the Defendants assert that the survivorship statute does not create an independent cause of action, but only preserves claims and identification of parties liable for damages if such liability is established. Accordingly, because they believe that Delbert Bonar would not have had a viable claim against them, the Defendants contend that they are entitled to summary judgment on the survivorship claim.

 A survivorship claim exists separate and apart from a wrongful death claim. *Shinaver v. Szymanski*, 14 Ohio St.3d 51, 471 N.E.2d 477, 482 (1984). In *Shinaver*, the court explained: "Under the general survival statute, R.C. § 2305.21, a victim's right of action for personal injuries survives and passes to her personal representative, and may be instituted for the benefit of the estate, notwithstanding that death resulted from injuries for which an action could also be maintained under the Wrongful Death Act, R.C. § 2125.01 *et seq.*" *Id.* Under *Shinaver*, although the survivorship claim may be asserted separate and apart from a wrongful death claim, it is asserted only on behalf of the decedent. In other words, the decedent's administrator brings a survivorship claim to assert the same cause of action that the decedent would have asserted on his own behalf had he survived. *Id.; see Dickerson v. Thompson*, 89 Ohio App.3d 399, 624 N.E.2d 784, 787 (1993) (stating that "[s]uch actions are instituted by the executor or administrator for the benefit of the decedent's estate, and are distinct from an action for wrongful death") (citation omitted).

Had he survived the shooting, Delbert Bonar would have been able to maintain an action against the Defendants for the injuries that he suffered from the shooting. Accordingly, the administrator of Delbert's estate may bring a survivorship action to maintain the cause of action that Delbert would have maintained had he survived.

Therefore, the Court **DENIES** the Defendants' Motion to Dismiss the survivorship claim asserted by Shirley Wingrove as the representative of Delbert Bonar's estate.

### c. Statutory Immunity

The Defendants claim that, even if they are not entitled to summary judgment with respect to the state law claims on substantive grounds, they are protected from the Plaintiffs' state law claims by state statutory immunity.

 The immunity for employees of political subdivisions is provided by Ohio Rev.Code § 2744.03(A)(6), which provides in relevant part:

In a civil action brought against ... an employee of a political subdivision to recover damages for injury, death, or loss to persons or property allegedly caused by any act or omission in connection with a governmental or proprietary function, ... the employee is immune from liability unless one of the following applies:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

(c) Liability is expressly imposed upon the employee by a section of the Revised Code.

OHIO REV.CODE § 2744.03(A)(6). "Recklessness," as it relates to Ohio Rev.Code § 2744.03(A)(6)(b) refers to an act done while knowing or having reason to know of facts that would lead a reasonable person to believe that the conduct creates an unreasonable risk of harm and that this risk is substantially greater than that necessary to make the conduct negligent. *Thompson v. McNeill,* 53 Ohio St.3d 102, 559 N.E.2d 705, 708 (1990) (citing Rest.2d of Torts § 500 (1965)). The issue of whether an officer's actions were reckless is usually appropriate for resolution by the trier of fact. *See Fabrey v. McDonald Village Police Dept.,* 70 Ohio St.3d 351, 639 N.E.2d 31, 35 (1994) ("the issue of wanton misconduct is normally a jury question"); *Potter v. Troy,* 78 Ohio App.3d 372, 604 N.E.2d 828, 837–38 (1992) (finding that the lower court erred in granting summary judgment on immunity grounds where there was a genuine issue of material fact as to whether city employees acted with malicious purpose, in bad faith, or in a wanton or reckless manner).

 A police officer is an employee of a political subdivision, and, as such, is generally protected by this grant of statutory immunity. *Mayes v. Columbus,* 105 Ohio App.3d 728, 664 N.E.2d 1340, 1348 (1995). Pursuant to the statute, a police officer cannot be held personally liable for mere negligence, but only for actions that fall into one of the above statutory exceptions to the immunity. *Fabrey,* 639 N.E.2d at 36 (Ohio 1994). The Court is to begin with the presumption of immunity. *Cook v. Cincinnati,* 103 Ohio App.3d 80, 658 N.E.2d 814, 821 (1995). Hence, the Defendant officers are entitled to immunity from the Plaintiffs' state law claims unless the Plaintiffs can demonstrate that the officers' actions fall within one of the three exceptions to the statutory immunity.

 The Court finds that the Plaintiffs have raised a genuine issue of material fact with respect to whether the exception to statutory immunity set forth in Ohio Rev. Code § 2744.03(A)(6)(b) applies to the Defendants. When the facts are viewed in the light most favorable to the Plaintiffs, it appears that the Defendants may have acted in a reckless manner. According to the Plaintiffs, the Defendants rushed into the Bonar residence, and almost immediately fired upon Delbert when he simply put down a bottle of water and picked up a phone. Surely, a reasonable juror might conclude that such actions created an unreasonable risk of harm that was substantially greater than the risk of harm necessary to make the conduct negligent. Of course, at trial, a jury may instead conclude that the Defendants' version of events is correct, and that the officers acted reasonably. As discussed above, however, a genuine issue of material fact exists on this issue. Under these circumstances, the trier of fact must resolve the issue of whether the officers acted in a reckless manner so as to deprive them of the immunity otherwise granted by statute.

Therefore, the Court **DENIES** the Defendants' Motion for Summary Judgment on the Plaintiffs' state law claims of wrongful death and survivorship.

## C. County and Official Capacity Claims

The Plaintiffs have asserted claims against the Defendant Officers in their official capacities, along with claims against Washington County. Washington County and Defendants Forshey, Wilson, and Schlicher in their official capacities ("County Defendants"), jointly filed a Motion for Summary Judgment on August 26, 2002. The Court now proceeds to consider the arguments set forth therein.

 A suit against a government employee in his or her official capacity "represent[s] only another way of pleading an action against an entity of which an

officer is an agent." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). If the government entity of which the officer is an agent receives notice and has an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon v. Holt*, 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985).

A government entity may be liable under 42 U.S.C. § 1983 if the plaintiff demonstrates that the execution of the entity's custom or policy caused the alleged deprivation of the plaintiff's rights. *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. A "custom" can be the basis for government liability if it is " 'so permanent and well settled as to constitute a "custom or usage" with the force of law.' " *Id.* at 690–91, 98 S.Ct. 2018 (internal quotation omitted). Similarly, a "policy" has been defined as "formal rules or understanding—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

To succeed on the claim, the plaintiff must demonstrate a direct causal link between the custom or policy and the constitutional deprivation by showing that the particular injury alleged was caused by the execution of the particular custom or policy. *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir.1993), *cert. denied*, 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). Indeed, the governmental entity must be the moving force behind the deprivation. *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397,

403–04, 117·S.Ct. 1382, 137 L.Ed.2d 626 (1997). Significantly, the municipality may not be held liable under a theory of *respondeat superior* based on the actions of its employees, but may only be found liable for its own violations. *Monell*, 436 U.S. at 691, 98 S.Ct. 2018.

Accordingly, neither Washington County nor the officers in their official capacities can be liable under 42 U.S.C. § 1983 unless the Plaintiffs establish that an official policy or custom led to, caused, or otherwise resulted in the deprivation of a constitutionally protected right.

### 1. Liability Based on the Knock and Announce Policy

As discussed above with respect to the Motion for Summary Judgment filed by the Defendants in their individual capacities, the Court finds, as a matter of law, that the WCSO's knock and announce policy is constitutional, and that the Defendants did not effect a constitutional violation when they executed that policy at the Bonar residence. *See* discussion *supra* Part IV.B.1.a. Accordingly, the Court **GRANTS** the County Defendants' Motion for Summary Judgment on the Plaintiffs' claims brought pursuant to 42 U.S.C. § 1983 based on the WCSO's knock and announce policy.

### 2. Deliberate Indifference Claim

The Plaintiffs claim that the County Defendants are liable under 42 U.S.C. § 1983 based on the fact that they were deliberately indifferent to the training, instruction, and supervision of the officers. In particular, while they do not challenge the constitutionality of the WCSO's written policy regarding the use of deadly force, they claim that the WCSO failed to train its officers to implement that policy in a proper manner.[15]

---

15. The WCSO's policy for the use of deadly force states: "Deputies shall use only such force as is reasonably necessary to effectively bring an incident under control, while pro-

tecting the life of the Deputy or another. Deadly force may be used only as a last resort: to defend the lives of Deputies or other

A municipality can be liable under 42 U.S.C. § 1983 for failing to train its employees adequately when those employees inflict constitutional harm on an individual. *Sova v. City of Mt. Pleasant,* 142 F.3d 898, 904 (6th Cir.1998). A plaintiff can establish municipal liability for failure to train "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). It is not enough for the plaintiff to demonstrate that the officer was improperly trained, or that the violation could have been avoided with better training. *Sova,* 142 F.3d at 904 (citing *City of Canton,* 489 U.S. at 390–91, 109 S.Ct. 1197). Rather, the plaintiff must establish that the governmental entity's failure to train was the "moving force" behind the violation. *Id.* (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). In particular, to establish liability, the plaintiff must prove: (1) that the training program at issue is inadequate to the tasks that officers must perform; (2) that the inadequacy is the result of the city's deliberate indifference; and (3) that the inadequacy is "closely related to" or "actually caused" the plaintiff's injury. *Hill v. McIntyre,* 884 F.2d 271, 275 (6th Cir.1989) (citing *City of Canton,* 489 U.S. at 390–91, 109 S.Ct. 1197).

The Court finds that the Plaintiffs have failed to raise a genuine issue of material fact with respect whether the County's alleged failure to train the Defendants was the moving force behind the alleged excessive use of force. First, the Defendants have presented evidence that they have a substantial training program that adequately trains officers regarding the use of deadly force. In particular, the

WCSO SRT members underwent training that included basic marksmanship drills, advanced marksmanship drills, weaponology, weapons familiarization, simulated training exercises, and classroom work. Further, the Defendants assert that this training program is not only adequate, but is consistent with FBI and DEA Standard Operating Procedures. The Plaintiffs have presented no evidence that contradicts this assertion. Second, the Plaintiffs have failed to present any evidence indicating that the County exhibited deliberate indifference to the Plaintiffs' right to be free from excessive force in creating or implementing the officers' training program. Third, the record is devoid of any evidence that Delbert Bonar's death can be linked to any act or omission by the County with respect to the officers' training on the use of deadly force.

Therefore, the Court **GRANTS** the County Defendants' Motion for Summary Judgment with respect to the Plaintiffs' claim of deliberate indifference.

### 3. Claims Against Sheriff Schlicher

The claims alleged against Sheriff Schlicher is his official capacity are based on his position as the policy-maker for the WCSO. As set forth above, the Court finds that the Plaintiffs have failed to raise a genuine issue of material fact either with respect to the WCSO's knock and announce policy or with respect to the WCSO's policy and training on the use of deadly force. Accordingly, the Court can discern no basis upon which Sheriff Schlicher could be liable in his official capacity as the WCSO policy-maker.

Therefore, the Court **GRANTS** the County Defendants' Motion for Summary Judgment with respect to the Plaintiffs'

persons ...." The policy goes on to state: "Deputies are authorized to use deadly force to ... [p]rotect him/herself or others from

what is reasonably believed to be an immediate threat of death or serious bodily harm ...."

**830**

claims against Sheriff Schlicher in his official capacity.

#### 4. State Law Claims

The County Defendants assert that they are entitled to sovereign immunity with respect to the Plaintiffs' state law claims. In their Memorandum Contra, however, the Plaintiffs clarify that their state law claims are asserted only against Defendants Forshey and Wilson. Therefore, the Court need not address whether the County Defendants would be entitled to immunity from the state law claims. As discussed above, the Court finds that the individual officers are not entitled to immunity from the Plaintiffs' state law claims because a genuine issue of material fact remains with respect to whether the Defendants acted recklessly when they shot Delbert Bonar.

### V. CONCLUSION

Based on the foregoing analysis, with respect to the Defendants' Motion for Summary Judgment filed in their individual capacities, the Court **GRANTS** that Motion with respect to: (1) the claims brought pursuant to 42 U.S.C. § 1983 based on the Defendants' execution of the knock and announce search warrant; (2) the claims alleged against Defendant Schlicher in his individual capacity; and (3) the claims brought pursuant to 42 U.S.C. § 1983 by Plaintiffs Albert Bonar, Dean Bonar, and William Bonar. The Court **DENIES** that Motion with respect to (1) Plaintiff Shirley Wingrove's claim brought pursuant to 42 U.S.C. § 1983 based on the Defendants' alleged excessive use of force; (2) the Plaintiffs' wrongful

death claim; and (3) the Plaintiffs' survivorship claim.

The Court **GRANTS** the Motion for Summary Judgment filed by County and the Defendants in their official capacities in its entirety.

**IT IS SO ORDERED.**