NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0769n.06

No. 10-4234

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jul 16, 2012*

LEONARD GREEN, Clerk

ROBERT FOOS, MARILYN FOOS, and )
ROBERT FOOS, Administrator for the )
Estate of Jeremy Foos, deceased, )
                        )
      Plaintiffs-Appellants, )
                        )
v. )   ON APPEAL FROM THE UNITED
                        )   STATES DISTRICT COURT FOR THE
CITY OF DELAWARE, DELAWARE )   SOUTHERN DISTRICT OF OHIO
POLICE DEPARTMENT, RUSS )
MARTIN, Chief of Police, ROBERT )
HATCHER, Police Officer, PATRICK )
GERKE, Police Officer, and DOES 1-10, )
                        )
      Defendants-Appellees. )

BEFORE:  CLAY and GIBBONS, Circuit Judges; KORMAN, District Judge.[*]

**EDWARD R. KORMAN, District Judge.**  "There are only so many ways that a person can be extracted from a vehicle against [his] will, and none of them is pretty.  Fists, batons, choke holds, dogs, tear gas, and chemical spray all carry their own risks to suspects and officers alike.  We see plenty of cases where someone on the business end of these techniques suffers serious injuries, not to mention injuries sustained by police officers who engage in hand-to-hand combat with recalcitrant individuals."  *Mattos v. Agarano*, 661 F.3d 433, 459 (9th Cir. 2011) (en banc) (Silverman, J.,

_____

[*] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

1

concurring in part and dissenting in part), *cert. denied* (May 29, 2012). These words provide an appropriate backdrop for this appeal, which arises out of the bizarre and unusual circumstances faced by law enforcement officers after twenty-nine-year-old Jeremy Foos ("Foos") crashed his four-door Ford F-150 truck head-on into a concrete pillar. Officer Robert Hatcher, the first officer who arrived at the scene, saw that a lot of smoke was emanating from the rear tires of the truck. Hatcher parked his police cruiser directly behind Foos's truck, keeping his red and blue emergency lights on. When Foos did not stop spinning the tires in response to the cruiser's lights, Hatcher turned on his siren, used different kinds of sirens, and then shined a spotlight into Foos's rearview mirror and driver's side mirror in an effort to get his attention. Foos, however, did not respond. Instead, he continued accelerating. Hatcher testified that he did not want to approach Foos's truck because of the spinning and smoking tires. Hatcher's impression was that Foos was trying to flee and that Foos had no idea he was parked behind him.

Officer Hatcher then approached Foos's truck from the driver's side, careful not to get too close because the tires were still spinning. In walking up to the truck, Hatcher noticed that the windows were very tinted, but he could still see Foos inside, violently rocking back and forth. Hatcher interpreted this rocking as Foos's attempt to use his body weight to rock the truck off the concrete structure. Officer Hatcher shined his flashlight into the driver's side window, but Foos still did not respond. Rather, he continued rocking back and forth, accelerating, and spinning the tires. Not knowing what Foos's intentions were, Hatcher walked up to the driver's side window with his service revolver drawn, hit the window with his flashlight to get Foos's attention, and yelled at him to stop and turn off the truck. Hatcher could hear Foos yelling inside the truck, but he could not

2

understand what he was saying. And, although Foos briefly looked at Officer Hatcher when he hit the window with his flashlight, he continued his erratic behavior.

Realizing that he was not going to get Foos to comply with his orders, Officer Hatcher backed away from the truck, "just knowing the danger that existed from that, from the vehicle being on there and the tires spinning." Hatcher remained some twenty or thirty feet away from the truck, on the driver's side, so that he could continue to observe Foos's behavior. He felt this was the safest place to be standing because, if the truck were to dislodge, it would move either forward or backward, but not sideways.

At that point, Officer Hatcher called for a medical squad to stage in the area so that, if Foos needed medical care, he could get it immediately. Officer Hatcher did not know what was wrong with Foos, testifying that, in his nine years as a police officer, he had never before seen anyone behave like Foos. Because he knew he could not handle Foos alone, Hatcher also asked for additional units to join him. These units arrived roughly five minutes later. Before they arrived, Hatcher observed that Foos had temporarily stopped accelerating his truck. Foos continued, however, to rock back and forth and to flail his arms, occasionally hitting the horn.

Officer Patrick Gerke was the first officer to arrive in response to Hatcher's call. He had heard through Officer Hatcher's radio transmission that a guy was trying to flee. Gerke thought that Foos "was out of his mind," that "[h]e was just completely crazy," and that he was rocking back and forth "like he was trying to get out of whatever he was in." While the truck did not actually move from its location, Gerke observed that it was moving back and forth in response to Foos's rocking. Gerke told Foos several times to stop and to turn the truck off. Although Foos would sometimes look up when the officers raised their voices, he did not respond to their orders.

3

The situation became even more urgent when the officers observed Foos positioned between the driver's and passenger's seats and reaching into the backseat. It was then that Officers Hatcher and Gerke determined that they needed to act right away. In Hatcher's view, Foos's reaching into the backseat was threatening because he did not know what Foos had in his truck, was unable to see what was inside the truck, and feared that there were weapons in the truck that Foos might pull on the officers. As Hatcher explained, "[w]e felt that he was a threat at that point, not knowing what he may be grabbing for." All of the officers on the scene then surrounded the truck and, as Gerke testified, everyone was concerned about what Foos was reaching for in the backseat. Moreover, one of the later arriving officers was specifically told not to stand behind the truck because, as Gerke explained, "[w]e were afraid that [the] vehicle was going to come off and hit him."

Hatcher and Gerke concluded that they were going to have to open one of the truck's locked doors to get Foos out, place him into custody, and do whatever needed to be done to get him help. As Gerke later testified, they did not consider disabling the truck by flattening its tires because it would have been unsafe to do so with the tires "spinning uncontrollably." Officer Gerke then used an ax to break the front driver's side window. While Gerke was doing this, Foos began accelerating again "to the point [that] the tires were spinning at a very high rate of speed and the area was filling up with smoke again." Foos continued to rock back and forth, and, in Gerke's view, it seemed that the breaking of the window had "agitated him even more." At that point, Hatcher determined that, because Foos was moving around violently, they were going to have to use a Taser on him "to try to contain him to an extent, control his muscle movement so we could either extract him or somebody could reach in to turn the ignition off to try to get control of the vehicle." Gerke testified

4

that he thought using a Taser on Foos "was the best thing that [they] could do in that situation" and that this would give them five seconds to turn off the truck's ignition.

Hatcher and Gerke were standing by the broken driver's side window at this point. Hatcher then aimed his Taser at Foos's chest area and fired. But this shot (or shots) had no effect, as Foos continued rocking back and forth and accelerating the truck. As Gerke put it, "Mr. Foos' combativeness didn't change at all." Officer Gerke then used his Taser on Foos—who was facing forward at this point—also aiming at Foos's chest area. This time, however, the Taser made contact. Foos stopped moving and, in a moan, told the officers to stop. With Foos no longer moving, Officer Hatcher was able to reach inside the truck and turn off the ignition.

Now that the driver's side door was unlocked and open, Officer Gerke was able to pull Foos out of his truck, at which point it became apparent that Foos was naked from the waist down. The Emergency Room ("E.R.") Report prepared at Grady Memorial Hospital, where Foos was ultimately taken, records that Foos "appeared to have been masturbating while at the wheel." As Foos was put on the ground, he was yelling, kicking his feet, and jerking back and forth, but he was not resisting the officers, nor was he responding to any of the officers' instructions. Foos was put on the ground so that the medics could look at him, and was placed in two pairs of handcuffs to give him more space. (We assume that the handcuffs were linked together to create a longer chain.) Officer Hatcher then called the medics, who were at the scene, to come and treat Foos. Foos was then put into a Reeves Sleeve—a stretcher constructed in a way that immobilizes the patient—and transported to the hospital. Officer Hatcher testified that he remained on the scene to process Foos's truck for impoundment.

5

Dr. Thomas J. Zuesi was the E.R. physician who treated Foos upon his arrival. Dr. Zuesi testified that, when Foos arrived at the E.R., he was "combative," "yelling incomprehensively," and "struggling to get out of the Reeves Sleeve." Dr. Zuesi was told that Foos had hit his head against the windshield of his truck, and Dr. Zuesi noticed that, consistent with this, Foos had a little bit of blood around his mouth. Dr. Zuesi also noticed that Foos appeared to be in a hyperagitated condition and that his pupils were dilated, which, Dr. Zuesi testified, is a sign of hyperstimulation. A urine drug screen also revealed that Foos tested positive for cocaine and amphetamines.

Shortly after his arrival, Foos had a seizure, which lasted less than a minute. After his seizure, Foos was no longer combative. But he stopped breathing and went into cardiopulmonary arrest. Dr. Zuesi and an Emergency Medical Services worker performed CPR, which successfully resuscitated Foos, and then hooked him up to an external pacemaker. At the time, Dr. Zuesi's working diagnosis was that "the precipitating event for all of this was methamphetamine and cocaine use, which led to hyperagitation and hyperthermia and seizure, with a profound acid/base abnormality that could be considered almost incompatible with life, given a pH of 6.8." Dr. Zuesi testified that he did not then know that a Taser had been used on Foos. But three years later, at his deposition, having reviewed all of the relevant lab tests and knowing that Foos had been tased, Dr. Zuesi explained that his working diagnosis had not changed. Dr. Zuesi stated that, "[i]n retrospect, knowing that he was Tased, I still can't attribute his initial presentation to the ER as the result of being Tased."

A few hours later, Foos was transferred to Grant Medical Center in Columbus, Ohio, where he would be able to get the critical care that was not available at Grady Memorial Hospital. Sadly, however, Foos died the next day. Shortly thereafter, Dr. William A. Cox, a pathologist with more

6

than 35 years of experience, performed an autopsy on Foos. In his affidavit, Dr. Cox stated that, "[b]ased on my education, training, experience, the records I reviewed and the autopsy I performed on Mr. Foos, it is my medical opinion, based upon a reasonable degree of medical probability and certainty, [(1)] that the cause of the death of Mr. Foos was cardiovascular collapse as a consequence of acute cardiac arrhythmia as a consequence of cocaine and its metabolites," (2) "that the tasers which struck Mr. Foos were not a proximate cause of his death," and (3) "that the tasers that struck Mr. Foos did not contribute in any way to Mr. Foos' death." Dr. Cox also stated that, during the autopsy, he observed "one puncture wound in Mr. Foos consistent with being struck by a taser and another potential puncture wound from a taser."

I.

On September 17, 2008, Robert and Marilyn Foos, the parents of Jeremy Foos, and Robert Foos, as Administrator of the Estate of Jeremy Foos, deceased (collectively, the "plaintiffs"), filed a verified complaint in the United States District Court for the Southern District of Ohio against the City of Delaware, the City of Delaware Police Department, Chief of Police Russ Martin, in his official capacity, Officer Robert Hatcher, in his individual capacity, Officer Patrick Gerke, in his individual capacity, and "Does 1 to 10" (collectively, the "defendants"). The complaint asserted eight claims. Because we later detail the nature of these claims and the disposition of them by the district court, it suffices to say here that, prior to trial, the district judge dismissed Claims One (wrongful death), Five (assault and battery), Seven (negligence), and Eight (strict liability) as to all defendants, dismissed Claim Six (police negligence) as to the City of Delaware and Chief Martin in his official capacity, and dismissed the City of Delaware Police Department as a defendant. The district judge also granted summary judgment to the remaining defendants on Claim Two

7

(survivorship), Claim Three (deprivation of familial relationships), Claim Four (excessive force and deliberate indifference to serious medical needs), and Claim Six (police negligence). The plaintiffs filed a timely notice of appeal.

We review a district court's grant of summary judgment *de novo*, *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 619 (6th Cir. 2006), applying the same standards as the district court, *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the burden of proving the absence of a genuine issue of material fact and its entitlement to summary judgment as a matter of law." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).

In deciding a summary judgment motion, the evidence of the nonmovant must be believed, *Enertech Elec., Inc. v. Mahoning Cnty. Comm'rs*, 85 F.3d 257, 259 (6th Cir. 1996), and the factual evidence must be viewed, and all reasonable inferences drawn, in favor of the nonmoving party—in this case, the plaintiffs, *Savage v. Gee*, 665 F.3d 732, 737 (6th Cir. 2012). "The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Provenzano*, 663 F.3d at 811 (internal quotation marks omitted). "Summary judgment should be denied if there is a genuine need for trial, which turns on whether the evidence is such that a reasonable jury could return a verdict for the plaintiff." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (internal quotation marks omitted).

## II.

*A. Excessive Force and Deliberate Indifference to Serious Medical Needs (Claim Four)*

8

Because of the centrality of Claim Four to the issues in this case, we discuss it first. The plaintiffs assert that the district court erred in granting summary judgment on their claims alleging excessive force and deliberate indifference to Foos's medical needs. We disagree.

*1. Excessive Force*

The Supreme Court has held that claims that law enforcement officers used excessive force during an arrest, investigatory stop, or other "seizure" of a free citizen "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388, 395 (1989). The determination of whether the force used was "reasonable" under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). The application of this "reasonableness" test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Nevertheless, "[t]he *Graham* factors do not constitute an exhaustive list; the ultimate question is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (quoting *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)).

In *Graham*, the Supreme Court emphasized that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." 490 U.S. at 396. Indeed, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of

9

force that is necessary in a particular situation." *Id.* at 396–97. And, "[a]s in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. In assessing the plaintiffs' excessive force claim here, all of the facts in the record must be construed in the light most favorable to them. *See Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010). Once we do so, the remaining question of whether the actions of the law enforcement officers were objectively reasonable is a pure question of law. *Id.*

Because the determination of whether the force used was reasonable under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake," *Graham*, 490 U.S. at 396 (internal quotation marks omitted), we turn first to the purpose and effect of Taser use. We have previously engaged in an extensive discussion of the exact manner in which this device immobilizes an individual and the nuanced differences between the modes by which a Taser can be employed. *See Cockrell v. City of Cincinnati*, No. 10-4605, 2012 WL 573972, at *1 (6th Cir. Feb. 23, 2012); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1040 n.1 (6th Cir. 1992); *see also Mattos*, 661 F.3d at 443. We see no need to repeat that discussion; instead, it is enough to say that, in the manner deployed here, it subjects the person being tased to an electric shock that "paralyz[es] the muscles throughout the body, [briefly] rendering the target limp and helpless." *Cockrell*, 2012 WL 573972, at *1 (internal quotation marks omitted). This was precisely what happened to Foos. He was paralyzed for the brief period necessary for the officers to remove him from the truck, but by the time he was placed on the ground, he was yelling, kicking his feet, and

10

jerking back and forth. Moreover, Foos's moan and request to the officers to stop is also consistent with the fact that the person tased experiences "excruciating pain" when first struck. *See id.* (internal quotation marks omitted).

Whether the use of a Taser was reasonable under the circumstances of this case turns initially on the issue of whether it was necessary for the law enforcement officers to intervene to bring the situation they faced under control, even if the purpose of the intervention was not to make an arrest. The answer is clearly yes. Both Hatcher and Gerke testified to their genuine fear that Foos would eventually succeed in dislodging the truck, thereby putting the officers and other individuals on the road in grave danger. Indeed, safety concerns led the officers to stand to the truck's side, rather than behind it. The danger posed by the truck's spinning tires was also the reason that Officer Gerke did not want to disable the truck by flattening its tires.[1]

The need for intervention was obvious. The only issue before us is the propriety of the use of the Taser to bring the situation under control. This issue is perhaps best framed by the following colloquy with the plaintiffs' attorney at oral argument:

| THE COURT: | Well, what should they have done in this crazy situation, if not try and remove him from that truck? |
| COUNSEL: | Well, their objective they didn't announce wasn't to remove him from the truck. Their objective was to turn off the engine. |
| THE COURT: | Well, they couldn't do that without removing him from the truck. |

---

[1] The plaintiffs argue that it was "obvious[]" to Hatcher and Gerke that the truck was permanently stuck and was not going to go anywhere, no matter how hard Foos tried to dislodge it. The plaintiffs offer no evidence in support of this assertion. Indeed, the plaintiffs are able to confidently argue about the truck's immobility only because they are viewing the scene "with the 20/20 vision of hindsight," which is not the proper perspective from which to analyze an excessive force claim. *See Graham*, 490 U.S. at 396.

11

COUNSEL:          Why couldn't they have just broken out the windows, and forced him back, and then turned off the engine?

THE COURT:        He wasn't exactly sitting quietly.

The argument of the plaintiffs' counsel that the officers should have "forced him back," while Foos was repeatedly accelerating a two-ton truck, flailing his arms violently, and otherwise behaving erratically and irrationally, suggests the kind of dangerous "hand-to-hand combat with recalcitrant individuals" that poses a risk of serious injury to both law enforcement officers and the individuals involved. *Mattos*, 661 F.3d at 459 (Silverman, J., concurring in part and dissenting in part). Moreover, Officers Hatcher and Gerke had special reason to fear for their safety when they saw Foos reaching repeatedly into the backseat for what could have been a weapon. This was of concern to all the officers on the scene—a concern that they were unable to dispel because the tinted windows made it more difficult for them to see what was going on inside the truck. Under these circumstances, "allow[ing] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *Graham*, 490 U.S. at 396–97, we cannot say that it was unreasonable for Officers Hatcher and Gerke to conclude that the use of a Taser on Foos was the "best thing that [they] could do in that situation" in order to "control his muscle movement so [they] could either extract him or somebody could reach in to turn the ignition off to try to get control of the vehicle."

In *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), the Eleventh Circuit held that the use of a Taser to effectuate an arrest during a traffic stop did not constitute excessive force when the individual arrested was "hostile, belligerent, and uncooperative," "used profanity, moved around and

12

paced in agitation, and repeatedly yelled at [the officer]," and refused to comply with the officer's repeated requests. 369 F.3d at 1278. The Eleventh Circuit concluded that, under the totality of the circumstances, the use of the Taser "was reasonably proportionate to the difficult, tense and uncertain situation that [the officer] faced in this traffic stop." *Id.*; *see also Hinton v. City of Elwood*, 997 F.2d 774, 781 (10th Cir. 1993) (concluding that it was not excessive force for officers to use a stun gun on an individual who "actively and openly" resisted arrest and bit the officers). This conclusion is equally applicable here.

Our opinion in *Landis v. Baker*, 297 F. App'x 453 (6th Cir. 2008), upon which the plaintiffs principally rely, is readily distinguishable. There, we held that law enforcement officers had used excessive force when they struck Charles Keiser with a baton ten times, used a Taser on him four times in the span of several seconds, and forced him face down into two feet of mud and water for at least ten to fifteen seconds, "when he was not actively resisting arrest or posing a threat to anyone in the vicinity." *Landis*, 297 F. App'x at 460–61 ("[T]he evidence tends to show that at the time of the fatal struggle, Keiser was no longer a threat to the officers nor was he actively attempting to flee."). As a result of this altercation, Kaiser drowned and died. *Id.* at 458. Although Keiser had previously ignored the officers' commands, had run away from them, and had even grabbed one officer by the throat, at the time when the officers exerted force upon him, Keiser was merely standing in a hole of water in the woods, was moving lethargically, was clearly unarmed, and "was behaving in a manner that could indicate a mental illness." *Id.* at 455–56, 461. In concluding that the officers' actions were objectively unreasonable, we observed that "[a] determination of the reasonableness of the defendant officers' conduct must take into account the fact that at the time of the fatal struggle, the defendant officers had reason to believe that Keiser was either on drugs or

13

mentally unstable *and* they knew that he was unarmed." *Id.* at 465 (emphasis added); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004) ("The diminished [mental] capacity of an *unarmed* detainee must be taken into account when assessing the amount of force exerted." (emphasis added)).

Unlike the suspect in *Landis*, however, Foos was not passively positioned when the officers used a Taser on him. Rather, he was actively accelerating his truck, making the tires spin "uncontrollably," and rocking back and forth violently. Unlike *Landis*, the present case does not involve a suspect who previously posed a threat and, at the time of the tasing, no longer did. Foos's attempt to dislodge the truck by accelerating the engine continued until the very moment he was tased. And, even though Foos appeared to be mentally unstable, it was not clear to the officers that he was unarmed—given the potential weapon in his backseat and the potential weapon the truck itself could become. *See Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008) ("It would have been reasonable for the Officers to be apprehensive that Dunn may have a weapon in the car, that the passenger may have a weapon, or that the car may be used as a weapon."). Moreover, unlike *Landis*, the officers here did not continue to tase or beat Foos once he had been immobilized. *Cf. Goodrich v. Everett*, 193 F. App'x 551, 556 (6th Cir. 2006) ("[C]ontinuing to beat a 'neutralized' suspect constitutes an unconstitutionally excessive use of force, as does continuing to spray mace on a suspect who has already been blinded and incapacitated." (citation omitted)); *Champion*, 380 F.3d at 901 (holding that it was not objectively reasonable for officers to "lay on top of Champion, a mentally retarded individual who had stopped resisting arrest and posed no flight risk, and spray[] him with pepper spray even after he was immobilized by handcuffs and a hobbling device"). Rather,

14

as soon as Foos was pulled out of the truck and put on the ground, no more force was used against him. Indeed, the officers' focus immediately shifted to getting Foos the medical care he needed.

The decision in *Kijowski v. City of Niles*, 372 F. App'x 595 (6th Cir. 2010), is likewise distinguishable. There, a law enforcement officer twice tased a non-resisting, non-threatening individual who had been passively sitting in his truck before he was dragged out and thrown to the ground. *Id.* at 599–600. As we described it, "he was inside a truck, talking to a 911 operator," and "[n]othing in the record suggest[ed] that he was attempting to drive the truck or that he had any kind of weapon on his person." *Id.* at 600. The body-flailing, tire-spinning, and potential-weapon-wielding scene that Hatcher and Gerke were confronted with is the exact opposite of that confronted in *Kijowski*.

In sum, viewing the evidence in the light most favorable to the plaintiffs, it was not objectively unreasonable for Officers Hatcher and Gerke to use a Taser on Foos. Our conclusion is not affected by the evidence suggesting that the officers fired two shots each. The pathologist who performed the autopsy on Foos stated that he "observed one puncture wound in Mr. Foos consistent with being struck by a taser and another potential puncture wound from a taser." This suggests that, even if the officers fired a total of four shots, as the plaintiffs argue, at most two of them made contact with Foos. The pathologist's statement is consistent with the testimony of Hatcher that the shot (or shots) he fired had no effect, and with the testimony of Gerke that it was only then that he fired his Taser, which ultimately immobilized Foos.

### 2. Deliberate Indifference to Foos's Medical Needs

"The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical

needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). While the Eighth Amendment applies only to post-conviction inmates, *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008), "[p]retrial detainees are analogously protected from such mistreatment under the Due Process Clause of the Fourteenth Amendment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted). The test to determine whether Officer Hatcher and Officer Gerke acted with deliberate indifference has both an objective and a subjective component. *Id.* "The objective component requires the existence of a 'sufficiently serious' medical need." *Blackmore*, 390 F.3d at 895. A medical need is sufficiently serious if it is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* at 899 (internal quotation marks omitted). And the subjective component requires a showing that the officers had "a sufficiently culpable state of mind in denying medical care." *Id.* at 895 (internal quotation marks omitted).

Here, although it is arguable that Foos's bizarre behavior demonstrated that he had a sufficiently serious medical need—albeit an unidentifiable one—it simply cannot be said that Officers Hatcher and Gerke exhibited a sufficiently culpable state of mind in denying Foos medical care. On the contrary, one of the first steps Officer Hatcher took when he arrived at the scene was to call for a medical squad to stage in the area so that Foos could get medical care quickly if he were to need it. Even while discussing how they were going to get control of Foos, Officers Hatcher and Gerke recognized that, once they got Foos out of the truck, they were going "to do what [they] needed to do to get him help." As soon as Foos was removed from the truck and handcuffed—notably, with two sets of handcuffs to give him more space—Officer Hatcher asked the waiting medical team to treat Foos. Foos was placed in a Reeves Sleeve and immediately taken

16

to Grady Memorial Hospital. In sum, the evidence shows that the officers did everything they could to make sure Foos received medical attention as soon as possible. Thus, even if the objective component of the deliberate indifference test can be made out, the subjective component cannot.

Because Foos's constitutional rights were not violated, it is not necessary to reach the issue of whether Officers Hatcher and Gerke would be entitled to qualified immunity. *See Cockrell*, 2012 WL 573972, at *2–7; *Mattos*, 661 F.3d at 446–48, 452. The absence of a constitutional violation also makes it unnecessary to address the issue of municipal liability under § 1983. This is so because succeeding on a municipal liability claim requires a plaintiff to establish "*that his or her constitutional rights were violated* and that a policy or custom of the municipality was the moving force behind the deprivation of the plaintiff's rights." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254–55 (6th Cir. 2010) (emphasis added) (internal quotation marks omitted). Consequently, the plaintiffs cannot succeed on their § 1983 cause of action against the City of Delaware or Chief Martin, in his official capacity. *See Smith v. Thornburg*, 136 F.3d 1070, 1078 n.12 (6th Cir. 1998); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Moreover, because the plaintiffs do not challenge on appeal the district court's disposition of their claim based on the Ohio Constitution, we do not address it. *See Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005).

## B. Deprivation of Familial Relationships (Claim Three)

It is well established in this Circuit that "a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort." *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000); *see also Jaco v. Bloechle*, 739 F.2d 239, 241–42 (6th Cir. 1984); *Wingrove v. Forshey*, 230 F. Supp. 2d 808, 824–25 (S.D. Ohio 2002) (discussing how other circuits hold a different view). Therefore, "only the purported victim, or his estate's representative(s), may

17

prosecute a section 1983 claim." *Claybrook*, 199 F.3d at 357. "[C]onversely, no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members." *Id.* "Those kinds of injuries are appropriately raised in a state tort law cause of action." *Garrett v. Belmont Cnty. Sheriff's Dep't*, 374 F. App'x 612, 615 (6th Cir. 2010). And a decedent's family members lack standing to bring such claims under § 1983. *See Jaco*, 739 F.2d at 242–43.

Here, the plaintiffs allege that the defendants deprived *them* of "their rights to familial relationships" and that, as a result, the plaintiffs "sustained general damages, including grief, emotional distress and pain and suffering and loss of comfort and society, and special damages, including loss of support." While we understand the unspeakable pain that Foos's parents endured, § 1983 does not provide them with a remedy.

*C. Police Negligence (Claim Six)*

Under Ohio law, the employee of a political subdivision, such as the City of Delaware, is immune from suit for injury, death, or loss to person or property, unless:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or]
> (c) Civil liability is expressly imposed upon the employee by a section of the [Ohio] Revised Code.

Ohio Rev. Code Ann. § 2744.03(A)(6). Under this statute, "a governmental employee acting within the scope of his employment is immunized from liability arising from the *negligent* performance of his duties." *Linley v. DeMoss*, 615 N.E.2d 631, 634 (Ohio Ct. App. 1992) (emphasis added) (internal quotation marks omitted).

18

The complaint here merely stated a claim for negligence. By contrast, in their opposition to the defendants' summary judgment motion, and now on appeal, the plaintiffs also assert that Officers Hatcher and Gerke were reckless in discharging their Tasers on Foos. Ohio courts have described "reckless" conduct, as that term is used in this statute, as "an act done while knowing or having reason to know of facts that would lead a reasonable person to believe that the conduct creates an unreasonable risk of harm and that this risk is substantially greater than that necessary to make the conduct negligent." *Wingrove*, 230 F. Supp. 2d at 827 (citing *Thompson v. McNeill*, 559 N.E.2d 705, 708 (Ohio 1990)). "Reckless" is often used interchangeably with "willful" and "wanton," *Thompson*, 559 N.E.2d at 708 n.1, and Ohio courts have described "wanton" conduct as that exhibiting "a complete lack of care," *Lytle v. Columbus*, 590 N.E.2d 421, 426 (Ohio Ct. App. 1990). The Ohio Supreme Court has also held that "mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor" and that "[s]uch perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury." *Fabrey v. McDonald Vill. Police Dep't*, 639 N.E.2d 31, 35 (Ohio 1994) (internal quotation marks omitted).

Under this stringent standard for demonstrating reckless and wanton misconduct, the district judge was correct in concluding that "the record is devoid of evidence or allegations that Officer Hatcher or Officer Gerke's actions were wanton or reckless." As the district judge observed, while the plaintiffs relied on medical journal articles showing that the use of a Taser on a person under the influence of drugs could be harmful, those articles were not published until well after Foos was tased. Moreover, there is no evidence that Hatcher and Gerke knew that Foos was under the influence of drugs.

19

*D. Concluded or Abandoned Claims (Claims One, Five, Six, and Two)*

 *1. Wrongful Death, Assault and Battery, and Police Negligence (Claims One, Five, and Six)*

 The plaintiffs did not contest below, and do not contest on appeal, the dismissal of Claim One (wrongful death) and Claim Five (assault and battery) against all of the named defendants, and the dismissal of Claim Six (police negligence) as to the City of Delaware and Chief Martin, in his official capacity. In addition, the plaintiffs did not contest, and do not now contest, the dismissal of the City of Delaware Police Department as a defendant. The plaintiffs have, therefore, conceded that these dismissals were proper—a concession on which we can rely. *See, e.g.*, *Days Inn Worldwide, Inc. v. Patel*, 445 F.3d 899, 904–05 (6th Cir. 2006).

 *2. Survivorship (Claim Two)*

 As for Claim Two (survivorship), the defendants assert that the plaintiffs have forfeited this claim because they failed to develop it on appeal. The plaintiffs' only discussion of the issue is contained in the following two sentences in their initial brief:

> The trial court failed to properly address the issue of survivorship as a claim derivative on the principal claims of Excessive Force, Deliberate Indifference, and Negligence. The trial court erred in granting Defendant-Appellee's motion for summary judgment on the primary claims; and therefore also committed reversible error by dismissing Plaintiff-Appellant's survivorship claim as well.

The plaintiffs do not develop their argument and fail to cite to any precedent laying out the contours of a survivorship claim. Under these circumstances, we deem the claim waived. *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (alteration omitted) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995))).

20

The defendants also argue that, because they raise it for the first time on appeal, the plaintiffs have forfeited the argument that Officers Hatcher and Gerke were deliberately indifferent to Foos's medical needs by failing to inform the E.R. staff at Grady Memorial Hospital that Foos had been tased. Although the defendants' forfeiture argument is not without merit, *see Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006); *Borger v. CSX Transp., Inc.*, 571 F.3d 559, 565 (6th Cir. 2009), the record nevertheless shows that Grady Memorial Hospital's E.R. staff was notified that Foos had been tased. Indeed, the Nursing Triage and Assessment form filled out at Grady states that Foos "was tazed." In addition, Hatcher did not accompany Foos to Grady, and there is no evidence that Gerke did.

## IV.

In sum, for the foregoing reasons, the judgment of the district court is affirmed.

**AFFIRMED.**