COOK, Circuit Judge.
More than 20 years after convicting Virginia LeFever of murdering her estranged husband, William LeFever, an Ohio trial court granted a new trial upon learning that the toxicologist whose forensic testimony implicated Virginia pleaded no contest to falsification charges for lying about his graduation date in prior proceedings. County authorities have since released Virginia from custody and declined to retry her, dismissing the underlying indictment without prejudice.
Virginia and her son Alex both sued various county officials and the relevant municipalities under 42 U.S.C. § 1983. Pertinent to this appeal, Virginia asserts concealment of impeachment and exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 *440 L.Ed.2d 215 (1968), and challenges the district court’s grants of qualified immunity-on those claims to the former chief toxicologist of the Franklin County Coroner’s Office James Ferguson, former Licking County coroner Dr. Robert Raker, and City of Newark detective Ken Ballantine. Alex alleges that the defendants violated his right to familial integrity by wrongfully convicting his mother and contests the district court’s orders dismissing and granting summary judgment on his familial-integrity claim.
For the following reasons, we AFFIRM the district court’s grants of summary judgment on qualified-immunity grounds to Ferguson, Dr. Raker, and Ballantine in Virginia’s case and its denial of Virginia’s summary judgment motion against Ferguson, as well as AFFIRM the dismissal of, and grants of summary judgment on, Alex’s claim.

I. BACKGROUND

A. Ohio’s Murder Case Against Virginia

Shortly before Virginia’s and William’s final divorce hearing, William visited the family home for dinner. After dinner and into the following day he displayed increasingly erratic and combative behavior. Virginia eventually called paramedics claiming to have discovered several pills missing from an old Elavil (antidepressant) prescription bottle. Nonetheless, William died. Before he died of cardio-pulmonary arrest, however, he[1] told a hospital nurse competing stories regarding the pills: (1) that he “couldn’t cope any more” and took them, and (2) that Virginia forced them on him.
The Licking County Coroner’s Office, led by Dr. Raker, investigated the alleged overdose and upon finding numerous bruises on the corpse — unusual for an overdose suicide — contacted Detective Bal-lantine. Dr. Raker ordered a forensic autopsy, which required transferring William’s corpse from Licking County to the Franklin County Coroner’s Office (FCCO).
Franklin County’s Chief of Forensic Pathology, Dr. Patrick Fardal, performed this 'autopsy and Ferguson performed a toxicology analysis. Thereafter, FCCO returned William’s body to Dr. Raker’s custody. The initial toxicology results led Ferguson to suspect that Virginia injected William with amitriptyline, a key ingredient in the antidepressant Elavil, so Ferguson requested that Dr. Raker examine William’s body for intramuscular injection sites. Dr. Raker found one suspicious injection site on William’s left buttock and sent Ferguson a biopsy from that site for toxicology testing. Tests revealed amitrip-tyline in the suspicious injection site and in William’s lower colon, indicative of both intramuscular injection and rectal administration. Ferguson also discovered two types of strychnine-poisoned rodent bait in William’s colon. At the conclusion of the autopsy and toxicology analysis, FCCO issued a report concluding that William died from exposure to amitriptyline.
The Newark Police Department’s investigation uncovered hypodermic needles and syringes, rodent-killing poison, and charred remains from “Smoke’em” fumigation pesticides in Virginia’s home. Interviews with LeFever’s young children revealed that the day before William died, Virginia lit one of the “Smoke’em” pesticides in a bedroom while he slept and then left with the children and family cat. Relying on the physical evidence, witness statements, and autopsy report, the Licking. County Prosecutor obtained an indictment from a grand jury in November 1988.
Before Virginia’s trial, Ferguson and Director of Forensic Toxicology Dr. Daniel Couri (also associated with FCCO) issued a supplemental toxicology report (Supple *441 mental Report) noting that arsenic and sulfur oxides, the primary gas generated by “Smoke’em” pesticides, contributed to William’s death. The Supplemental Report found arsenic in William’s hair, nails, kidney, heart, and liver.
Ultimately, the Supplemental Report concluded that William “died as a consequence of multiple administration of toxic agents,” with amitriptyline poisoning as the “immediate cause.” In response, Dr. Raker issued a supplemental death certificate listing acute amitriptyline and nor-triptyline poisoning by intramuscular injection as the primary cause of William’s death, now classified as a homicide. It further recorded acute poisoning by sulfur oxide, arsenic, and strychnine via pulmonary and rectal routes, as well as chronic arsenic poisoning via an oral route as other significant conditions.
Following a bench trial, an Ohio court convicted Virginia of murder. She spent more than 20 years in prison until revelations about Ferguson’s misrepresented graduation date led the court to order a new trial in November 2010. In granting the new trial, the court doubted Virginia’s innocence, but nonetheless found that Ferguson’s dishonesty regarding his graduation date resulted in an unfair trial.

B. Virginia’s § 1983 Suit

After the Ohio trial court ordered her release from prison, Virginia sued various defendants, including Ferguson, Dr. Raker, and Ballantine, asserting claims under federal and state law. Those claims include § 1983 claims for failure to disclose evidence — evidence that Virginia now sees as valuable for impeachment and thus exculpatory under Brady — and for fabrication of evidence.
Ferguson, Dr. Raker, and Ballantine each moved for summary judgment. Virginia moved for partial summary judgment against Ferguson on her Brady claim.
In resolving these motions, the district court first denied Ferguson absolute and qualified immunity on Virginia’s fabrication-of-evidence claim, allowing it to proceed. Second, it denied Virginia’s motion for partial summary judgment against Ferguson on her Brady claim. Third, it granted qualified immunity to Ferguson and Dr. Raker on Virginia’s Brady claims, finding neither had a clearly established duty to disclose the evidence Virginia claims to have been exculpatory or impeaching. Fourth, it granted Ballantine qualified immunity on Virginia’s Brady claims, discerning no constitutional violation.
Ferguson immediately appealed the denial of absolute immunity. This court reversed, granting Ferguson absolute testimonial immunity on Virginia’s fabrication-of-evidence claim. LeFever v. Ferguson, 567 Fed.Appx. 426, 431 (6th Cir.2014).
Virginia now appeals the district court’s grants of summary judgment on qualified-immunity grounds to Ferguson, Dr. Raker, and Ballantine on her claims for failure to disclose the evidence she claims to be impeachment/exculpatory under Brady, as well as the denial of her motion for summary judgment against Ferguson on that claim.

C. Alex’s § 1983 Suit

Following Virginia’s release, her son Alex also sued Ferguson, Dr. Raker, Bal-lantine, and Bill Hatfield, another City of Newark police officer, alleging that their fabricated murder theories and failure to disclose exculpatory evidence violated Alex’s substantive due process right to familial integrity. Alex also asserted that Licking County’s, Franklin County’s, and the City of Newark’s policies and practices led to the violation of this right. Dr. Rak *442 er and Licking County moved to dismiss Alex’s claim, and the other defendants moved for summary judgment. Ruling on Dr. Raker’s and Licking County’s motion, the district court dismissed Alex’s claim for the violation of his right to familial integrity, finding that any injury he experienced flowed from the constitutional violations suffered by Virginia, and Sixth Circuit precedent foreclosed § 1983 actions for harm suffered by others. Granting summary judgment to the other defendants on this claim logically followed. Alex appeals.

II. ANALYSIS

A. Virginia’s Brady Claims
We review the district court’s grant of summary judgment de novo, affirming if the evidence demonstrates no genuine issue as to any material fact and, construing the evidence and reasonable inferences in favor of the non-movant, the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Wesley v. Campbell, 779 F.3d 421, 434-35 (6th Cir.2015).
In evaluating claims for qualified immunity, this court considers whether there was (1) a constitutional violation, (2) of a clearly established right, and (3) whether the plaintiff has alleged facts supported by evidence showing that an official engaged in objectively unreasonable conduct. Moldowan v. City of Warren, 578 F.3d 351, 375 (6th Cir.2009) (quoting Williams v. Mehra, 186 F.3d 685, 691 (6th Cir.1999) (en banc)). Once officials raise the qualified-immunity defense, the plaintiff bears the burden to “demonstrate that the officials are not entitled to qualified immunity.” Silberstein v. City of Dayton, 440 F.3d 306, 311 (6th Cir.2006).
To establish a violation of her constitutional rights under Brady, Virginia must prove that a defendant withheld favorable exculpatory or impeachment evidence; the state suppressed that evidence; and the suppression resulted in prejudice, meaning that the suppressed evidence was material. Robinson v. Mills, 592 F.3d 730, 735 (6th Cir.2010). Material evidence creates a “reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different,” Cone v. Bell, 556 U.S. 449, 470, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009), meaning nondisclosure “undermine[s] confidence in the verdict,” id. (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). We consider evidence alleged to violate Brady collectively to determine materiality. Kyles, 514 U.S. at 436, 115 S.Ct. 1555. And when determining whether undisclosed “ ‘information [is] material and therefore prejudicial,’ a reviewing court considers ‘it in light of the evidence available for trial that supports the ... conviction;’ ” Jalowiec v. Bradshaw, 657 F.3d 293, 305 (6th Cir.2011) (quoting Jells v. Mitchell, 538 F.3d 478, 502 (6th Cir.2008)).
We decide Virginia’s case on grounds other than those relied upon by the district court. The district court used the clearly-established prong to determine that Ferguson and Dr. Raker enjoyed qualified immunity. By contrast, we determine that neither Ferguson nor Dr. Raker violated Virginia’s constitutional rights under Brady. Because Virginia briefed the issue of whether the evidence Ferguson and Dr. Raker failed to disclose violated those rights, we may affirm the grant of summary judgment on this alternate ground. See Thornton v. Fed. Express Corp., 530 F.3d 451, 456 n. 2 (6th Cir.2008).
1. Did Ferguson Violate Virginia’s Rights Under Brady?
Virginia contends that Ferguson’s failure to disclose three evidentiary matters *443 would have altered her trial in her favor: (1) lies told about his graduation date at her trial and others, (2) his “true conclusions about arsenic,” and (3) a fanciful manuscript he authored about Virginia’s case. None thwart qualified immunity.

a. Ferguson’s Graduation-Date Lie

Virginia attempts to show that Ferguson withheld material evidence by pointing to his lie — told at her trial and previous trials — that he graduated from The Ohio State University in 1972 when he in fact graduated in 1987. She argues that had Ferguson disclosed this lie to her before trial, including that he had testified falsely in other trials, she could have destroyed his credibility, thereby undermining confidence in the outcome of her trial. But Virginia overlooks several key considerations.
First, Ferguson told the same lie at every trial: the date he graduated. And as he reminds, absolute immunity shields his testimony at Virginia’s trial — even lies. Rehberg v. Paulk, — U.S. —, 132 S.Ct. 1497, 1505, 182 L.Ed.2d 593 (2012); Briscoe v. LaHue, 460 U.S. 325, 329-31, 341-45, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). Virginia thus tries to bootstrap Ferguson’s failure to disclose his lies at other trials into a Brady claim for failure to disclose material impeachment evidence at her trial. But ultimately her claim relies on the lie told at her trial — one that was immunized.
Second, even had Virginia known that Ferguson lied at previous trials about his graduation date, those lies provide little impeachment value given Ferguson’s otherwise strong credentials as a toxicology expert at the time of Virginia’s trial. For example, Ferguson had been performing chemical and toxicology analysis and testifying as an expert witness for over 20 years by the time of Virginia’s trial in February 1990. Additionally, at the time of Virginia’s trial Ferguson had obtained his undergraduate degree, even though forensic toxicologists need not possess a college degree to work in Ohio. Exposing the lie he told about the year he graduated, therefore, would have made little difference in assessing his credibility.
Third, Ferguson’s lie about his graduation date leaves unscathed the scientific analysis underlying his conclusions. Had Virginia tried to impeach Ferguson for lying about his graduation date, his analysis of facts and data would have remained unimpeached. Indeed, Virginia makes no suggestion that Ferguson performed invalid or erroneous scientific testing while working on her case.
Virginia points us to Westerfield v. United States, 483 Fed.Appx. 950, 962, 955 (6th Cir.2012), in which we found a detective’s failure to disclose that he perjured himself — at the criminal trial of the plaintiffs co-defendant — material under Brady when the detective’s testimony at the plaintiffs criminal trial provided the only evidence of an element necessary to convict the plaintiff. Relying on Westerfield, Virginia argues that Ferguson’s perjury must be material evidence under Brady. But here, despite Ferguson’s graduation-date lie, ample evidence remained to conclude that Virginia poisoned William and, therefore, to support her murder conviction. For example, Ferguson’s lie in no way undermines the underlying data or toxicology analysis that he performed to conclude how various toxins entered William’s body. As another example, Ferguson possessed the credentials to interpret the data and to perform the various analyses that he used to reach the conclusions to which he testified. Because Ferguson’s graduation-date lie leaves confidence in the outcome of Virginia’s criminal trial intact, nondisclosure of that evidence caused Virginia no *444 prejudice and thus constitutes no Brady violation.

b. Ferguson’s Arsenic Conclusion

Next, Virginia argues that Ferguson should have disclosed “[h]is true eon-elusion[] about arsenic”: that he could not identify the route of entry to a reasonable degree of scientific certainty. She contrasts this “true conclusion” — testified to at Ferguson’s deposition for this case — with his trial testimony that acute arsenic poisoning was administered rectally. But we already determined that he possesses absolute immunity for his criminal-trial testimony, including any lies, regarding the administration of arsenic in Virginia’s case. LeFever, 567 Fed.Appx. at 431. This immunity absolves him from Virginia’s claim for the nondisclosure of his “true conclusion” about arsenic. See Imbler v. Pachtman, 424 U.S. 409, 431 n. 34, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (finding that absolute immunity prevents liability under Brady for suppressing the “evidence upon which the knowledge of perjury rested”).
In any event, Virginia fails to show any discrepancy in the opinion he offered at her trial and the opinion he held at the time of his deposition in this case. At Virginia’s criminal trial, Ferguson testified to a reasonable degree of scientific certainty about acute arsenic poisoning, opining that it “was administered rectally.” At that trial he also testified that he held no opinion on how the chronic arsenic poisoning was administered. At his deposition in this case — taken 22 years after Virginia’s trial — however, when asked the unqualified question “how the arsenic got into [William’s] body,” Ferguson testified that he reached no opinion. His deposition taken for this case included only questions on arsenic generally, not on acute or chronic arsenic poisoning specifically. Virginia thus shows no contradiction between Ferguson’s trial and deposition testimony.
In addition, Virginia also fails to undermine the validity of the evidence supporting Ferguson’s acute-arsenic opinion. At trial, Ferguson testified that acute poisoning resulted from the arsenic found in William’s colon and that rectal administration readily explained the presence of that arsenic. Virginia’s version of Ferguson’s “true conclusion” regarding general arsenic administration contradicts none of his testimony regarding the evidence supporting his acute-arsenic rectal-administration opinion, namely the high levels of arsenic in William’s dried feces and the lack of pathological signs consistent with an oral dose. Ferguson’s “true conclusion” regarding the route of arsenic administration, therefore, provides neither impeachment nor exculpatory value and fails to undermine confidence in the outcome of Virginia’s criminal trial.
c. Ferguson’s Fanciful Manuscript
Finally, Virginia argues that Ferguson should have disclosed the manuscript he authored before her trial detailing the work he did on her case because it reveals his bias against her. But Ferguson’s manuscript was not evidence. Indeed, he testified that he wrote the manuscript for personal interest, not for use at Virginia’s trial. At most the manuscript shows that Ferguson believed Virginia to be guilty, but a prosecution witness believing the defendant guilty is hardly unusual or inappropriate.
Even assuming that Virginia could have introduced the manuscript to impeach Ferguson at trial, she presents no argument how the manuscript would have accomplished that goal. The district court considered the manuscript’s impeachment value when deciding Ballantine’s summary judgment motion and highlighted that the *445 manuscript in no way undermines the science behind Ferguson’s testimony. Indeed, in the manuscript Ferguson stated his testimony at trial “will be restricted to expounding on the toxicological facts” but “[t]he courts will decide ... who[m] [to] believe[].” And Ferguson never tried to profit from the manuscript in any way. Virginia simply fails to show how she could have used this manuscript to impeach Ferguson, much less impeach him so thoroughly as to undermine confidence in the outcome of her trial.

d. The Three Together Fail to Undermine Confidence in Trial Fairness

Virginia argues that, taken together, these three undisclosed evidentiary matters undermine confidence in her trial’s outcome. She points to the trial judge’s worry that Ferguson’s testimony cemented the case. But the trial judge doubted her innocence even as he ordered her release and for good reason. For one, none of the “undisclosed” evidentiary matters attack the underlying facts or science as synthesized, which supported the state’s murder theory and contradicted Virginia’s suicide theory. For another, none of this “evidence” attacks the 27 other witnesses offered by the prosecution — and over 50 total — at her trial. Individually none of the evidentiary -matters Virginia identifies have sufficient impeachment value to undermine confidence in the outcome of her trial. Considering this evidence cumulatively yields the same result.
Even viewing the evidence in her favor, Virginia fails to carry her burden of showing that the evidence Ferguson withheld undermines confidence in the outcome of her trial. She thus fails to show that Ferguson violated her constitutional right to material impeachment or exculpatory evidence under Brady. The district court correctly determined that qualified immunity shields Ferguson and granted summary judgment to him on Virginia’s Brady claim.
2. Did Dr. Raker Violate Virginia’s Rights Under Brady?
Virginia next argues that Dr. Raker violated her constitutional right to material exculpatory or impeachment evidence by failing to disclose: (1) his “true opinions” on how arsenic and strychnine entered William’s body, and (2) the manuscript Ferguson authored.
Both of Dr. Raker’s allegedly “true opinions” about how arsenic and strychnine entered William’s body deviate from the death certificate. Virginia gleans Dr. Raker’s “true opinion” for. arsenic entry to be the oral route, compared with the death certificate he signed targeting “acute [arsenic] poisoning by pulmonary and rectal” routes and “chronic [arsenic] poisoning by oral route.” And though the death certificate lists a rectal route of entry for strychnine, Dr. Raker’s “true opinion” was that he heíd no opinion on strychnine entry. Virginia asserts that' if disclosed, these “true opinions” may have prompted the trial judge to reach a different verdict because they undermine the prosecution’s theory on how those toxins entered William’s body, as well as damage Dr. Raker’s and Ferguson’s credibility. But three considerations undercut Virginia’s position.
First, no evidence contradicts the facts supporting the rectal-administration-of-arsenic theory — namely, the high levels of arsenic in William’s dried feces and an absence of “any pathologic sign of gastric erosion ... consistent with an oral dose.” Similarly, Dr. Raker’s “true opinion” about strychnine fails to negate the fact that Ferguson found “two types of strychnine poisoned rodent bait in [William’s] colon.”
*446 Second, Dr. Raker undertook no independent toxicology analysis, relying instead on Ferguson’s work to determine what to report on the death certificate. Dr, Raker’s amending the death certificate to reflect the conclusions that Ferguson reached by performing the toxicology analysis thus leaves Dr. Raker’s credibility unimpeached.
Third, attacking the routes of entry of arsenic and strychnine with Dr. Raker’s “true opinions” still leaves unchallenged the amitriptyline-by-intramuscular-injection as the cause of death. So assaulting the arsenic and strychnine theories fails to undermine the main theory of how William died.
Virginia also restates her argument about Ferguson’s manuscript because Dr. Raker saw a copy. But as previously discussed, Ferguson’s manuscript provides negligible impeachment value.
Considering the evidence collectively and in her favor, Virginia fails to show that the evidence Dr. Raker allegedly should have disclosed undermines confidence in the outcome of her trial. The district court properly granted qualified immunity. to Dr. Raker on Virginia’s claim that he failed to disclose material exculpatory or impeachment evidence under Brady,
3. Did Ballantine Violate Virginia’s Rights tinder Brady?
Finally, Virginia asserts a Brady claim against Ballantine. Unlike with Ferguson and Dr. Raker, the district court passed on the materiality of the exculpatory or impeachment evidence on Ballantine’s motion for summary judgment and determined that the evidence Ballantine allegedly withheld constituted no Brady violation.
Virginia points to three evidentiary matters that she believes may have altered the outcome of her trial had Ballantine disclosed them, therefore rendering him liable under Brady, She argues that he should have disclosed: (1) a witness statement by Virginia’s former co-worker Susan Hamann regarding syringes; (2) notes from his conversation with FCCO Pathologist Dr. Fardal in which Dr. Fardal “could not say whether [the strychnine in William] came by mouth or anus;” and (3) Ferguson’s fanciful manuscript.
Beginning with Hamann’s unrevealed witness statement, Virginia alleges that it listed the lot numbers of syringes from Hamann’s and Virginia’s workplace, and speculates that this statement “would have shown that the syringes found in the LeFever house were not the same ones stocked where Virginia worked.” But as the district court observed, even if this statement exists and even if it shows that the syringes found at the LeFever house came from somewhere other than Virginia’s work, that fact “is not exculpatory.” Connecting Virginia to syringes from her workplace would have been strong inculpa-tory evidence. That Virginia may not have had syringes from her work shows nothing.
Next, Ballantine’s notes from his conversation with Dr. Fardal also provide no value to Virginia. As with Dr. Raker, Dr. Fardal performed no independent toxicology analysis, instead relying on Ferguson’s work. The district court thus reasoned that Dr. Fardal’s lack of opinion as to whether strychnine entered William’s body orally or rectally is hardly surprising — he performed no analysis allowing him to form such an opinion. In any event, Dr. Fardal offered no opinion at trial on how strychnine entered William’s body. Also, Dr. Fardal’s non-opinion on strychnine has no bearing on the state’s primary theory of death: an intramuscular injection of amitriptyline. Accordingly, Ballantine’s notes prove impotent for im *447 peachment, as does Ferguson’s manuscript, as previously explained.
Taken together, the evidence Virginia claims Ballantine should have disclosed provides neither impeachment nor exculpatory value. Considering the evidence in Virginia’s favor, she fails to meet her burden of showing that its nondisclosure un-dérmines confidence in the outcome of her criminal trial. The district court properly granted Qualified immunity, and thus summary judgment, to Ballantine on Virginia’s Brady claim.

B. Alex’s Claim for the Violation of His Right to Familial Integrity

1. Procedural Posture and Standard of Review
On appeal, Alex challenges the district court’s' grant of Dr. Raker’s motion to dismiss his substantive' due process claim brought under § 1983 for the deprivation of his right to familial integrity, as well as the district court’s attendant grants of summary judgment to Ferguson and Bal-lantine on that claim.[1]
We review the dismissal of a plaintiffs claim under Rule 12(b)(6) de novo, Kolley v. Adult Protective Servs., 725 F.3d 581, 585 (6th Cir.2013), to determine whether the complaint “contain[s] sufficient factual matter, accepted as true, to ‘state a claim to relief that is plausible on its face,’” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Because no defendant disputes acting under the color of state law when engaging in the conduct Alex complains of, we consider whether any conduct deprived Alex of his right to familial integrity. See Ziegler v. Aukerman, 512 F.3d 777, 781 (6th Cir.2008).
2. Alex’s Right to Familial Integrity
Alex implores this court to follow Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir.1987), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir.1999), which allowed children of a parent killed by the police to pursue, claims for losses of familial companionship and society. Because the defendants violated his personally held right to familial integrity, Alex argues, the district court erred by finding his claim derivative of his mother’s and dismissing it.
But Smith is at odds with our precedents. Claims under § 1983 are personal to the party injured by a constitutional violation. See Jaco v. Bloechle, 739 F.2d 239, 241 (6th Cir.1984). Indeed, we have repeatedly found that.§ 1983 provides no relief for injuries collateral to the violation of another person’s constitutional right. *448 Claybrook v. Birchwell, 199 F.3d 350, 357 (6th Cir.2000) (“[0]nly the purported victim, or his estate’s representative(s), may prosecute a section 1983 claim; conversely, no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim’s family members.”); see also Foos v. City of Delaware, 492 Fed.Appx. 582, 592-93 (6th Cir.2012). In fact, we juxtaposed the Ninth Circuit’s holding in Smith that § 1983 allows children to assert claims for deprivation of the parent-child relationship with our conclusion that “section 1983 provides a cause of action which is personal to the injured party.” Purnell v. City of Akron, 925 F.2d 941, 948 n. 6 (6th Cir.1991).
Because Alex alleges that the defendants violated his right to familial integrity by trampling his mother’s constitutional rights leading to her wrongful conviction, he raises a non-cognizable claim for a collateral injury.

Ill CONCLUSION

We AFFIRM the district court’s grants of summary judgment on qualified-immunity grounds to Ferguson, Dr. Raker, and Ballantine for Virginia’s Brady claims; AFFIRM the denial of Virginia’s motion for summary judgment against Ferguson on her Brady claim; and AFFIRM the dismissal of, and grants of summary judgment on, Alex’s familial-integrity claim.